# ALLIED-SIGNAL, INC., AS SUCCESSOR-IN-INTEREST TO BENDIX CORP. v. DIRECTOR, DIVISION OF TAXATION

No. 91–615. Argued March 4, 1992—Reargued April 22, 1992— Decided June 15, 1992

KENNEDY, J., delivered the opinion of the Court, in which WHITE, STEVENS, SCALIA, and SOUTER, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, C. J., and BLACKMUN and THOMAS, JJ., joined, *post*, p. 790.

*Walter Hellerstein* reargued the cause for petitioner. With him on the briefs were *Prentiss Willson, Jr., Harry R. Jacobs, Robyn H. Pekala, Andrew L. Frey, Kenneth S. Geller, Charles Rothfeld,* and *Bennett Boskey. Andrew L. Frey* argued the cause for petitioner on the original argument. With him on the briefs were Messrs. Willson, Hellerstein, and Jacobs, *Evan M. Tager,* and Mr. Boskey.

*Mary R. Hamill,* Deputy Attorney General of New Jersey, reargued the cause for respondent. With her on the briefs

were *Robert J. Del Tufo,* Attorney General, *Joseph L. Yannotti,* Assistant Attorney General, and *Sarah T. Darrow,* Deputy Attorney General.*

---

*Briefs of *amici curiae* urging reversal were filed for Coca-Cola Co. et al. by *Mark L. Evans, James P. Tuite, Alan I. Horowitz,* and *Anthony F. Shelley;* for the Committee on State Taxation by *Amy Eisenstadt;* for General Motors Corp. et al. by *Jerome B. Libin* and *Kathryn L. Moore;* for the Tax Executives Institute, Inc., by *Timothy J. McCormally;* and for Williams Cos., Inc., by *Rose Mary Ham* and *Henry G. Will.*

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *Daniel E. Lungren,* Attorney General of California, *Timothy G. Laddish,* Assistant Attorney General, and *Benjamin F. Miller,* and by the Attorneys General for their respective States as follows: *Charles E. Cole* of Alaska, *Robert A. Butterworth* of Florida, *Larry Echo-Hawk* of Idaho, *Robert T. Stephan* of Kansas, *Michael E. Carpenter* of Maine, *Marc Racicot* of Montana, *John P. Arnold* of New Hampshire, *Nicholas Spaeth* of North Dakota, *Ernest D. Preate, Jr.,* of Pennsylvania, *R. Paul Van Dam* of Utah, *Jeffrey L. Amestoy* of Vermont, and *James E. Doyle* of Wisconsin; for the Commonwealth of Massachusetts et al. by *Scott Harshbarger,* Attorney General of Massachusetts, and *Thomas A. Barnico,* Assistant Attorney General, *Richard Blumenthal,* Attorney General of Connecticut, *J. Joseph Curran,* Attorney General of Maryland, and *Mary Sue Terry,* Attorney General of Virginia; for the City of New York by *O. Peter Sherwood* and *Edward F. X. Hart;* and for the Multistate Tax Commission by *Alan H. Friedman, Paull Mines,* and *Scott D. Smith.*

Briefs of *amici curiae* were filed for the State of Alabama et al. by *Mary Sue Terry,* Attorney General of Virginia, *H. Lane Kneedler,* Chief Deputy Attorney General, *Gail Starling Marshall,* Deputy Attorney General, *Gregory E. Lucyk* and *N. Pendleton Rogers,* Senior Assistant Attorneys General, and *Barbara H. Vann* and *Martha B. Brissette,* Assistant Attorneys General, *Peter W. Low, Jimmy Evans,* Attorney General of Alabama, *Grant Woods,* Attorney General of Arizona, *Winston Bryant,* Attorney General of Arkansas, *Gale Norton,* Attorney General of Colorado, *John Payton,* Corporation Counsel of the District of Columbia, *Robert A. Butterworth,* Attorney General of Florida, *Michael J. Bowers,* Attorney General of Georgia, *Elizabeth Barrett-Anderson,* Attorney General of Guam, *Warren Price III,* Attorney General of Hawaii, *Linley E. Pearson,* Attorney General of Indiana, *Chris Gorman,* Attorney General of Kentucky, *Richard Ieyoub,* Attorney General of Louisiana, *Frank J. Kelley,* Attorney General of Michigan, *Mike Moore,* Attorney General of Mississippi, *Marc Racicot,* Attorney General of Montana, *Don Stenberg,* Attor-

JUSTICE KENNEDY delivered the opinion of the Court.

Among the limitations the Constitution sets on the power of a single State to tax the multistate income of a nondomiciliary corporation are these: There must be "a 'minimal connection' between the interstate activities and the taxing State," *Mobil Oil Corp.* v. *Commissioner of Taxes of Vt.*, 445 U. S. 425, 436–437 (1980) (quoting *Moorman Mfg. Co.* v. *Bair*, 437 U. S. 267, 273 (1978)), and there must be a rational relation between the income attributed to the taxing State and the intrastate value of the corporate business. 445 U. S., at 437. Under our precedents, a State need not attempt to isolate the intrastate income-producing activities from the rest of the business; it may tax an apportioned sum of the corporation's multistate business if the business is unitary. *E. g., ASARCO Inc.* v. *Idaho Tax Comm'n*, 458 U. S. 307, 317

ney General of Nebraska, *Frankie Sue Del Papa*, Attorney General of Nevada, *Tom Udall*, Attorney General of New Mexico, *Robert Abrams*, Attorney General of New York, *Lacy H. Thornburg*, Attorney General of North Carolina, *Nicholas J. Spaeth*, Attorney General of North Dakota, *Lee Fisher*, Attorney General of Ohio, *Susan B. Loving*, Attorney General of Oklahoma, *Mark Barnett*, Attorney General of South Dakota, *Dan Morales*, Attorney General of Texas, *Paul Van Dam*, Attorney General of Utah, *Rosalie S. Ballentine*, Attorney General of the Virgin Islands, *Ken Eikenberry*, Attorney General of Washington, *Mario J. Palumbo*, Attorney General of West Virginia, *James E. Doyle*, Attorney General of Wisconsin, and *Joseph B. Meyer*, Attorney General of Wyoming; for the State of Connecticut et al. by *J. Joseph Curran, Jr.*, Attorney General of Maryland, and *Gerald Langbaum* and *Andrew H. Baida*, Assistant Attorneys General, *Richard Blumenthal*, Attorney General of Connecticut, *Bonnie J. Campbell*, Attorney General of Iowa, *Scott Harshbarger*, Attorney General of Massachusetts, *Hubert H. Humphrey III*, Attorney General of Minnesota, *Ernest D. Preate, Jr.*, Attorney General of Pennsylvania, and *James E. O'Neil*, Attorney General of Rhode Island; for American General Corp. by *Roy E. Crawford, Russell D. Uzes*, and *Karen A. Bain;* for American Home Products Corp. et al. by *William L. Goldman* and *Anne G. Batter;* for Amway Corp. et al. by *Timothy B. Dyk* and *Edward K. Bilich;* for Chevron Corp. by *Toni Rembe, Jeffrey M. Vesely,* and *C. Douglas Floyd;* and for the Financial Institutions State Tax Coalition by *Philip M. Plant* and *Haskell Edelstein.*

(1982). A State may not tax a nondomiciliary corporation's income, however, if it is "derive[d] from 'unrelated business activity' which constitutes a 'discrete business enterprise.'" *Exxon Corp.* v. *Department of Revenue of Wis.*, 447 U. S. 207, 224 (1980) (quoting *Mobil Oil, supra,* at 442, 439). This case presents the questions: (1) whether the unitary business principle remains an appropriate device for ascertaining whether a State has transgressed its constitutional limitations; and if so, (2) whether, under the unitary business principle, the State of New Jersey has the constitutional power to include in petitioner's apportionable tax base certain income that, petitioner maintains, was not generated in the course of its unitary business.

## I

Petitioner Allied-Signal, Inc., is the successor-in-interest to the Bendix Corporation (Bendix). The present dispute concerns Bendix's corporate business tax liability to the State of New Jersey for the fiscal year ending September 30, 1981. Although three items of income were contested earlier, the controversy in this Court involves only one item: the gain of $211.5 million realized by Bendix on the sale of its 20.6% stock interest in ASARCO Inc. (ASARCO). The case was submitted below on stipulated facts, and we begin with a summary.

During the times in question, Bendix was a Delaware corporation with its commercial domicile and corporate headquarters in Michigan. Bendix conducted business in all 50 States and 22 foreign countries. App. 154. Having started business in 1929 as a manufacturer of aviation and automotive parts, from 1970 through 1981, Bendix was organized in four major operating groups: automotive; aerospace/electronics; industrial/energy; and forest products. *Id.,* at 154–155. Each operating group was under separate management, but the chief executive of each group reported to the chairman and chief executive officer of Bendix. *Id.,* at

155.   In this period Bendix's primary operations in New Jersey were the development and manufacture of aerospace products.   App. 161.

ASARCO is a New Jersey corporation with its principal offices in New York.   It is one of the world's leading producers of nonferrous metals, treating ore taken from its own mines and ore it obtains from others.   *Id.*, at 163–164. From December 1977 through November 1978, Bendix acquired 20.6% of ASARCO's stock by purchases on the open market.   *Id.*, at 165.   In the first half of 1981, Bendix sold its stock back to ASARCO, generating a gain of $211.5 million.   *Id.*, at 172.   The issue before us is whether New Jersey can tax an apportionable part of this income.

Our determination of the question whether the business can be called "unitary," see *infra*, at 788–789, is all but controlled by the terms of a stipulation between the taxpayer and the State.   They stipulated: "During the period that Bendix held its investment in ASARCO, Bendix and ASARCO were unrelated business enterprises each of whose activities had nothing to do with the other."   App. 169. Furthermore,

> "[p]rior to and after its investment in Asarco, no business or activity of Bendix (in New Jersey or otherwise), either directly or indirectly (other than the investment itself), was involved in the nonferrous metal production business or any other business or activity (in New Jersey or otherwise) in which Asarco was involved.   On its part, Asarco had no business or activity (in New Jersey or otherwise) which, directly or indirectly, was involved in any of the businesses or activities (in New Jersey or otherwise) in which Bendix was involved.   None of Asarco's activities, businesses or income (in New Jersey or otherwise) were related to or connected with Bendix's activities, business or income (in New Jersey or otherwise)."   *Id.*, at 164–165.

The stipulation gives the following examples of the independence of the businesses:

> "There were no common management, officers, or employees of Bendix and Asarco. There was no use by Bendix of Asarco's corporate plant, offices or facilities and no use by Asarco of Bendix's corporate plant, offices or facilities. There was no rent or lease of any property by Bendix from Asarco and no rent or lease of any property by Asarco from Bendix. Bendix and Asarco were each responsible for providing their own legal services, contracting services, tax services, finance services and insurance. Bendix and Asarco had separate personnel and hiring policies . . . and separate pension and employee benefit plans. Bendix did not lend monies to Asarco and Asarco did not lend monies to Bendix. There were no joint borrowings by Bendix and Asarco. Bendix did not guaranty any of Asarco's debt and Asarco did not guaranty any of Bendix's debt. Asarco had no representative on Bendix's Board of Directors. Bendix did not pledge its Asarco stock. As far as can be determined there were no sales of product by Asarco itself to Bendix or by Bendix to Asarco. There were certain sales of product in the ordinary course of business by Asarco subsidiaries to Bendix but these sales were minute compared to Asarco's total sales . . . . These open market sales were at arms length prices and did not come about due to the Bendix investment in Asarco. There were no transfers of employees between Bendix and Asarco." *Id.,* at 169–171.

While Bendix held its ASARCO stock, ASARCO agreed to recommend that two seats on the 14-member ASARCO Board of Directors be filled by Bendix representatives. The seats were filled by Bendix chief executive officer W. M. Agee and a Bendix outside director. *Id.,* at 168. Nonetheless, "Bendix did not exert any control over Asarco." *Ibid.*

After respondent assessed Bendix for taxes on an apportioned amount which included in the base the gain realized upon Bendix's disposition of its ASARCO stock, Bendix sued for a refund in New Jersey Tax Court. The case was decided based upon the stipulated record we have described, and the Tax Court held that the assessment was proper. *Bendix Corp.* v. *Taxation Div. Director*, 10 N. J. Tax 46 (1988). The Appellate Division affirmed, *Bendix Corp.* v. *Director, Div. of Taxation*, 237 N. J. Super. 328, 568 A. 2d 59 (1989), and so, in turn, did the New Jersey Supreme Court, *Bendix Corp.* v. *Director, Div. of Taxation*, 125 N. J. 20, 592 A. 2d 536 (1991).

The New Jersey Supreme Court held it was constitutional to consider the gain realized from the sale of the ASARCO stock as earned in Bendix's unitary business, drawing from our decision in *Container Corp. of America* v. *Franchise Tax Bd.*, 463 U. S. 159, 166 (1983), the principle that "the context for determining whether a unitary business exists has, as an overriding consideration, the exchange or transfer of value, which may be evidenced by functional integration, centralization of management, and economies of scale." 125 N. J., at 34, 592 A. 2d, at 543–544. The New Jersey Supreme Court went on to state: "The tests for determining a unitary business are not controlled, however, by the relationship between the taxpayer recipient and the affiliate generator of the income that becomes the subject of State tax." *Id.*, at 35, 592 A. 2d, at 544. Based upon Bendix documents setting out corporate strategy, the court found that the acquisition and sale of ASARCO "went well beyond . . . passive investments in business enterprises," *id.*, at 36, 592 A. 2d, at 544, and Bendix "essentially had a business function of corporate acquisitions and divestitures that was an integral operational activity." *Ibid.* As support for its conclusion that the proceeds from the sale of the ASARCO stock were attributable to a unitary business, the New Jersey Supreme Court relied in part on the fact that Bendix intended to use those pro-

ceeds in what later proved to be an unsuccessful bid to acquire Martin Marietta, a company whose aerospace business, it was hoped, would complement Bendix's aerospace/electronics business. *Id.*, at 36, 592 A. 2d, at 545.

We granted certiorari. 502 U. S. 977 (1991). At the initial oral argument in this case New Jersey advanced the proposition that all income earned by a nondomiciliary corporation could be apportioned by any State in which the corporation does business. To understand better the consequences of this theory we requested rebriefing and reargument. Our order asked the parties to address three questions:

> "1. Should the Court overrule *ASARCO Inc.* v. *Idaho State Tax Comm'n,* 458 U. S. 307 (1982), and *F. W. Woolworth Co.* v. *Taxation and Revenue Dept. of New Mexico,* 458 U. S. 354 (1982)?
>
> "2. If *ASARCO* and *Woolworth* were overruled, should the decision apply retroactively?
>
> "3. If *ASARCO* and *Woolworth* were overruled, what constitutional principles should govern state taxation of corporations doing business in several states?" 503 U. S. 928 (1992).

Because we give a negative answer to the first question, see *infra,* at 783–786, we need not address the second and third.

## II

The principle that a State may not tax value earned outside its borders rests on the fundamental requirement of both the Due Process and Commerce Clauses that there be "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax." *Miller Brothers Co.* v. *Maryland,* 347 U. S. 340, 344–345 (1954). The reason the Commerce Clause includes this limit is self-evident: In a Union of 50 States, to permit each State to tax activities outside its borders would have drastic conse-

quences for the national economy, as businesses could be subjected to severe multiple taxation. But the Due Process Clause also underlies our decisions in this area. Although our modern due process jurisprudence rejects a rigid, formalistic definition of minimum connection, we have not abandoned the requirement that, in the case of a tax on an activity, there must be a connection to the activity itself, rather than a connection only to the actor the State seeks to tax, see *Quill Corp.* v. *North Dakota, ante,* at 306–308. The constitutional question in a case such as *Quill Corp.* is whether the State has the authority to tax the corporation at all. The present inquiry, by contrast, focuses on the guidelines necessary to circumscribe the reach of the State's legitimate power to tax. We are guided by the basic principle that the State's power to tax an individual's or corporation's activities is justified by the "protection, opportunities and benefits" the State confers on those activities. *Wisconsin* v. *J. C. Penney Co.,* 311 U. S. 435, 444 (1940).

Because of the complications and uncertainties in allocating the income of multistate businesses to the several States, we permit States to tax a corporation on an apportionable share of the multistate business carried on in part in the taxing State. That is the unitary business principle. It is not a novel construct, but one that we approved within a short time after the passage of the Fourteenth Amendment's Due Process Clause. We now give a brief summary of its development.

When States attempted to value railroad or telegraph companies for property tax purposes, they encountered the difficulty that what makes such a business valuable is the enterprise as a whole, rather than the track or wires that happen to be located within a State's borders. The Court held that, consistent with the Due Process Clause, a State could base its tax assessments upon "the proportionate part of the value resulting from the combination of the means by which the business was carried on, a value existing to an

appreciable extent throughout the entire domain of operation." *Adams Express Co.* v. *Ohio State Auditor,* 165 U. S. 194, 220–221 (1897) (citing *Western Union Telegraph Co.* v. *Attorney General of Massachusetts,* 125 U. S. 530 (1888)); *Massachusetts* v. *Western Union Telegraph Co.,* 141 U. S. 40 (1891); *Maine* v. *Grand Trunk R. Co.,* 142 U. S. 217 (1891); *Pittsburgh, C., C. & St. L. R. Co.* v. *Backus,* 154 U. S. 421 (1894); *Cleveland, C., C. & St. L. R. Co.* v. *Backus,* 154 U. S. 439 (1894); *Western Union Telegraph Co.* v. *Taggart,* 163 U. S. 1 (1896); *Pullman's Palace Car Co.* v. *Pennsylvania,* 141 U. S. 18 (1891).

*Adams Express* recognized that the principles that permit a State to levy a tax on the capital stock of a railroad, telegraph, or sleeping car company by reference to its unitary business also allow proportional valuation of a unitary business in enterprises of other sorts. As the Court explained: "The physical unity existing in the former is lacking in the latter; but there is the same unity in the use of the entire property for the specific purpose, and there are the same elements of value arising from such use." 165 U. S., at 221.

The unitary business principle was later permitted for state taxation of corporate income as well as property and capital. Thus, in *Underwood Typewriter Co.* v. *Chamberlain,* 254 U. S. 113, 120–121 (1920), we explained:

> "The profits of the corporation were largely earned by a series of transactions beginning with manufacture in Connecticut and ending with sale in other States. In this it was typical of a large part of the manufacturing business conducted in the State. The legislature in attempting to put upon this business its fair share of the burden of taxation was faced with the impossibility of allocating specifically the profits earned by the processes conducted within its borders. It, therefore, adopted a method of apportionment which, for all that appears in this record, reached, and was meant to reach, only the profits earned within the State."

As these cases make clear, the unitary business rule is a recognition of two imperatives: the States' wide authority to devise formulae for an accurate assessment of a corporation's intrastate value or income; and the necessary limit on the States' authority to tax value or income that cannot in fairness be attributed to the taxpayer's activities within the State. It is this second component, the necessity for a limiting principle, that underlies this case.

As we indicated in *Mobil Oil Corp.* v. *Commissioner of Taxes of Vt.*, 445 U. S., at 442: "Where the business activities of the dividend payor have nothing to do with the activities of the recipient in the taxing State, due process considerations might well preclude apportionability, because there would be no underlying unitary business." The constitutional question becomes whether the income "derive[s] from 'unrelated business activity' which constitutes a 'discrete business enterprise.'" *Exxon Corp.* v. *Department of Revenue of Wis.*, 447 U. S., at 224 (quoting *Mobil Oil, supra,* at 442, 439).

Although *Mobil Oil* and *Exxon* made clear that the unitary business principle limits the States' taxing power, it was not until our decisions in *ASARCO Inc.* v. *Idaho Tax Comm'n*, 458 U. S. 307 (1982), and *F. W. Woolworth Co.* v. *Taxation and Revenue Dept. of N. M.*, 458 U. S. 354 (1982), that we struck down a state attempt to include in the apportionable tax base income not derived from the unitary business. In those cases the States sought to tax unrelated business activity.

The principal question in *ASARCO* concerned Idaho's attempt to include in the apportionable tax base of ASARCO certain dividends received from, among other companies, the Southern Peru Copper Corp. 458 U. S., at 309, 320. The analysis is of direct relevance for us because we have held that for constitutional purposes capital gains should be treated as no different from dividends. *Id.,* at 330. The ASARCO in the 1982 case was the same company as the

ASARCO here. It was one of four of Southern Peru's shareholders, owning 51.5% of its stock. Under an agreement with the other shareholders, ASARCO was prevented from dominating Southern Peru's board of directors. ASARCO had the right to appoint 6 of Southern Peru's 13 directors, while 8 votes were required for the passage of any resolution. Southern Peru was in the business of producing unrefined copper (a nonferrous ore), some of which it sold to its shareholders. ASARCO purchased approximately 35% of Southern Peru's output, at average representative trade prices quoted in a trade publication and over which neither Southern Peru nor ASARCO had any control. *Id.*, at 320–322. We concluded that "ASARCO's Idaho silver mining and Southern Peru's autonomous business [were] insufficiently connected to permit the two companies to be classified as a unitary business." *Id.*, at 322.

On the same day we decided *ASARCO*, we decided *Woolworth*. In that case, the taxpayer company was domiciled in New York and operated a chain of retail variety stores in the United States. In the company's apportionable state tax base, New Mexico sought to include earnings from four subsidiaries operating in foreign countries. The subsidiaries also engaged in chainstore retailing. 458 U. S., at 356–357. We observed that although the parent company had the potential to operate the subsidiaries as integrated divisions of a single unitary business, that potential was not significant if the subsidiaries in fact comprise discrete business operations. *Id.*, at 362. Following the indicia of a unitary business defined in *Mobil Oil*, we inquired whether any of the three objective factors were present. The factors were: (1) functional integration; (2) centralization of management; and (3) economies of scale. 458 U. S., at 364. We found that "[e]xcept for the type of occasional oversight—with respect to capital structure, major debt, and dividends—that any parent gives to an investment in a subsidiary," *id.*, at 369,

none of these factors was present. The subsidiaries were found not to be part of a unitary business. *Ibid.*

Our most recent case applying the unitary business principle was *Container Corp. of America* v. *Franchise Tax Bd.*, 463 U. S. 159 (1983). The taxpayer there was a vertically integrated corporation which manufactured custom-ordered paperboard packaging. *Id.*, at 171. California sought to tax income it received from its wholly owned and mostly owned foreign subsidiaries, each of which was in the same business as the parent. *Id.*, at 171–172. The foreign subsidiaries were given a fair degree of autonomy: They purchased only 1% of their materials from the parent, and personnel transfers from the parent to the subsidiaries were rare. *Id.*, at 172. We recognized, however:

> "[I]n certain respects, the relationship between appellant and its subsidiaries was decidedly close. For example, approximately half of the subsidiaries' long-term debt was either held directly, or guaranteed, by appellant. Appellant also provided advice and consultation regarding manufacturing techniques, engineering, design, architecture, insurance, and cost accounting to a number of its subsidiaries, either by entering into technical service agreements with them or by informal arrangement. Finally, appellant occasionally assisted its subsidiaries in their procurement of equipment, either by selling them used equipment of its own or by employing its own purchasing department to act as an agent for the subsidiaries." *Id.*, at 173.

Based on these facts, we found that the taxpayer had not met its burden of showing by " " "clear and cogent evidence" ' " that the State sought to tax extraterritorial values. *Id.*, at 175, 164 (quoting *Exxon Corp.*, *supra*, at 221, in turn quoting *Butler Brothers* v. *McColgan*, 315 U. S. 501, 507 (1942), in turn quoting *Norfolk & Western R. Co.* v. *North Carolina ex rel. Maxwell*, 297 U. S. 682, 688 (1936)).

In the course of our decision in *Container Corp.*, we reaffirmed that the constitutional test focuses on functional integration, centralization of management, and economies of scale. 463 U. S., at 179 (citing *Woolworth, supra,* at 364; *Mobil Oil, supra,* at 438). We also reiterated that a unitary business may exist without a flow of goods between the parent and subsidiary, if instead there is a flow of value between the entities. 463 U. S., at 178. The principal virtue of the unitary business principle of taxation is that it does a better job of accounting for "the many subtle and largely unquantifiable transfers of value that take place among the components of a single enterprise" than, for example, geographical or transactional accounting. *Id.,* at 164–165 (citing *Mobil Oil,* 445 U. S., at 438–439).

Notwithstanding the Court's long experience in applying the unitary business principle, New Jersey and several *amici curiae* argue that it is not an appropriate means for distinguishing between income generated within a State and income generated without. New Jersey has not persuaded us to depart from the doctrine of *stare decisis* by overruling our cases that announce and follow the unitary business standard. In deciding whether to depart from a prior decision, one relevant consideration is whether the decision is "unsound in principle." *Garcia* v. *San Antonio Metropolitan Transit Authority,* 469 U. S. 528, 546 (1985). Another is whether it is "unworkable in practice." *Ibid.* And, of course, reliance interests are of particular relevance because "[a]dherence to precedent promotes stability, predictability, and respect for judicial authority." *Hilton* v. *South Carolina Public Railways Comm'n,* 502 U. S. 197, 202 (1991) (citing *Vasquez* v. *Hillery,* 474 U. S. 254, 265–266 (1986)). See also *Quill Corp.* v. *North Dakota, ante,* at 316 (industry's reliance justifies adherence to precedent); *ante,* at 320 (SCALIA, J., concurring in part and concurring in judgment) (same). Against this background we address the arguments of New Jersey and its *amici.*

New Jersey contends that the unitary business principle must be abandoned in its entirety, arguing that a nondomiciliary State should be permitted "to apportion all the income of a separate multistate corporate taxpayer." Brief for Respondent on Reargument 27. According to New Jersey, the unitary business principle does not reflect economic reality, while its proposed theory does. We are not convinced.

New Jersey does not appear to dispute the basic proposition that a State may not tax value earned outside its borders. It contends instead that all income of a corporation doing any business in a State is, by virtue of common ownership, part of the corporation's unitary business and apportionable. See Tr. of Oral Arg. 25–26 (Apr. 22, 1992). New Jersey's sweeping theory cannot be reconciled with the concept that the Constitution places limits on a State's power to tax value earned outside of its borders. To be sure, our cases give States wide latitude to fashion formulae designed to approximate the in-state portion of value produced by a corporation's truly multistate activity. But that is far removed from New Jersey's theory that any business in the State, no matter how small or unprofitable, subjects all of a corporation's out-of-state income, no matter how discrete, to apportionment.

According to New Jersey, Brief for Respondent on Reargument 11, there is no logical distinction between short-term investment of working capital, which all concede is apportionable, see Reply Brief for Petitioner on Reargument 4–5, and n. 3; Tr. of Oral Arg. 7–8 (Apr. 22, 1992); *Container Corp.,* *supra,* at 180, n. 19, and all other investments. The same point was advanced by the dissent in *ASARCO,* 458 U. S., at 337 (opinion of O'CONNOR, J.). New Jersey's basic theory is that multistate corporations like Bendix regard all of their holdings as pools of assets, used for maximum long-term profitability, and that any distinction between operational and investment assets is artificial. We may assume, *arguendo,* that the managers of Bendix cared most about the

profits entry on a financial statement, but that state of mind sheds little light on the question whether in pursuing maximum profits they treated particular intangible assets as serving, on the one hand, an investment function, or, on the other, an operational function. See *Container Corp., supra,* at 180, n. 19. That is the relevant unitary business inquiry, one which focuses on the objective characteristics of the asset's use and its relation to the taxpayer and its activities within the taxing State. It is an inquiry to which our cases give content, and which is necessary if the limits of the Due Process and Commerce Clauses are to have substance in a modern economy. In short, New Jersey's suggestion is not in accord with the well-established and substantial case law interpreting the Due Process and Commerce Clauses.

Our precedents are workable in practice; indeed, New Jersey conceded as much. See Tr. of Oral Arg. 37–38 (Apr. 22, 1992). If lower courts have reached divergent results in applying the unitary business principle to different factual circumstances, that is because, as we have said, any number of variations on the unitary business theme "are logically consistent with the underlying principles motivating the approach," *Container Corp., supra,* at 167, and also because the constitutional test is quite fact sensitive.

Indeed, if anything would be unworkable in practice, it would be for us now to abandon our settled jurisprudence defining the limits of state power to tax under the unitary business principle. State legislatures have relied upon our precedents by enacting tax codes which allocate intangible nonbusiness income to the domiciliary State, see App. to Brief for Petitioner on Reargument 1a–7a (collecting statutes). Were we to adopt New Jersey's theory, we would be required either to invalidate those statutes or authorize what would be certain double taxation. And, of course, we would defeat the reliance interest of those corporations that have structured their activities and paid their taxes based upon the well-established rules we here confirm. Difficult ques-

tions respecting the retroactive effect of our decision would also be presented. See *James B. Beam Distilling Co.* v. *Georgia,* 501 U. S. 529 (1991). New Jersey's proposal would disrupt settled expectations in an area of the law in which the demands of the national economy require stability.

Not willing to go quite so far as New Jersey, some *amici curiae* urge us to modify, rather than abandon, the unitary business principle. See, *e. g.,* Brief for Multistate Tax Commission as *Amicus Curiae;* Brief for Multistate Tax Commission as *Amicus Curiae* on Reargument; Brief for Chevron Corporation as *Amicus Curiae.* They urge us to hold that the Constitution does not require a unitary business relation between the payor and the payee in order for a State to apportion the income the payee corporation receives from an investment in the payor. Rather, they urge us to adopt as the constitutional test the standard set forth in the business income definition in § 1(a) of the Uniform Division of Income for Tax Purposes Act (UDITPA), 7A U. L. A. 331, 336 (1985). Under UDITPA, "business income," which is apportioned, is defined as: "income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." UDITPA § 1(a). "Non-business income," which is allocated, is defined as "all income other than business income." § 1(e).

In the abstract, these definitions may be quite compatible with the unitary business principle. See *Container Corp., supra,* at 167 (noting that most of the relevant provisions of the California statute under which we sustained the challenged tax there were derived from UDITPA). Furthermore, the unitary business principle is not so inflexible that as new methods of finance and new forms of business evolve it cannot be modified or supplemented where appropriate. It does not follow, though, that apportionment of all income

is permitted by the mere fact of corporate presence within the State; and New Jersey offers little more in support of the decision of the State Supreme Court.

We agree that the payee and the payor need not be engaged in the same unitary business as a prerequisite to apportionment in all cases. *Container Corp.* says as much. What is required instead is that the capital transaction serve an operational rather than an investment function. 463 U. S., at 180, n. 19. Hence, in *ASARCO*, although we rejected the dissent's factual contention that the stock investments there constituted "interim uses of idle funds 'accumulated for the future operation of [the taxpayer's] . . . business [operation],'" we did not dispute the suggestion that had that been so the income would have been apportionable. 458 U. S., at 325, n. 21.

To be sure, the existence of a unitary relation between the payor and the payee is one means of meeting the constitutional requirement. Thus, in *ASARCO* and *Woolworth* we focused on the question whether there was such a relation. We did not purport, however, to establish a general requirement that there be a unitary relation between the payor and the payee to justify apportionment, nor do we do so today.

It remains the case that "[i]n order to exclude certain income from the apportionment formula, the company must prove that 'the income was earned in the course of activities unrelated to [those carried out in the taxing] State.'" *Exxon Corp.* v. *Department of Revenue of Wis.*, 447 U. S., at 223 (quoting *Mobil Oil Corp.* v. *Commissioner of Taxes of Vt.*, 445 U. S., at 439). The existence of a unitary relation between payee and payor is one justification for apportionment, but not the only one. Hence, for example, a State may include within the apportionable income of a nondomiciliary corporation the interest earned on short-term deposits in a bank located in another State if that income forms part of the working capital of the corporation's unitary business, notwithstanding the absence of a unitary relationship be-

tween the corporation and the bank. That circumstance, of course, is not at all presented here. See *infra* this page and 789.

## III

Application of the foregoing principles to the present case yields a clear result: The stipulated factual record now before us presents an even weaker basis for inferring a unitary business than existed in either *ASARCO* or *Woolworth*, making this an *a fortiori* case. There is no serious contention that any of the three factors upon which we focused in *Woolworth* were present. Functional integration and economies of scale could not exist because, as the parties have stipulated, "Bendix and Asarco were unrelated business enterprises each of whose activities had nothing to do with the other." App. 169. Moreover, because Bendix owned only 20.6% of ASARCO's stock, it did not have the potential to operate ASARCO as an integrated division of a single unitary business, and of course, even potential control is not sufficient. *Woolworth*, 458 U. S., at 362. There was no centralization of management.

Furthermore, contrary to the view expressed below by the New Jersey Supreme Court, see 125 N. J., at 36–37, 592 A. 2d, at 544–545, the mere fact that an intangible asset was acquired pursuant to a long-term corporate strategy of acquisitions and dispositions does not convert an otherwise passive investment into an integral operational one. Indeed, in *Container Corp.* we noted the important distinction between a capital transaction that serves an investment function and one that serves an operational function. 463 U. S., at 180, n. 19 (citing *Corn Products Refining Co.* v. *Commissioner*, 350 U. S. 46, 50–53 (1955)). If that distinction is to retain its vitality, then, as we held in *ASARCO*, the fact that a transaction was undertaken for a business purpose does not change its character. 458 U. S., at 326. Idaho had argued that intangible income could be treated as earned in the course of a unitary business if the intangible property

which produced that income is "'acquired, managed or disposed of for purposes relating or contributing to the taxpayer's business.'" *Ibid.* (quoting Brief for Appellee 4). In rejecting the argument we observed:

> "This definition of unitary business would destroy the concept. The business of a corporation requires that it earn money to continue operations and to provide a return on its invested capital. Consequently *all* of its operations, including any investment made, in some sense can be said to be 'for purposes related to or contributing to the [corporation's] business.' When pressed to its logical limit, this conception of the 'unitary business' limitation becomes no limitation at all." 458 U. S., at 326.

Apart from semantics, we see no distinction between the "purpose" test we rejected in *ASARCO* and the "ingrained acquisition-divestiture policy" approach adopted by the New Jersey Supreme Court. 125 N. J., at 36, 592 A. 2d, at 544. The hallmarks of an acquisition that is part of the taxpayer's unitary business continue to be functional integration, centralization of management, and economies of scale. *Container Corp.* clarified that these essentials could respectively be shown by: transactions not undertaken at arm's length, 463 U. S., at 180, n. 19; a management role by the parent that is grounded in its own operational expertise and operational strategy, *ibid.;* and the fact that the corporations are engaged in the same line of business, *id.,* at 178. It is undisputed that none of these circumstances existed here.

The New Jersey Supreme Court also erred in relying on the fact that Bendix intended to use the proceeds of its gain from the sale of ASARCO to acquire Martin Marietta. Even if we were to assume that Martin Marietta, once acquired, would have been operated as part of Bendix's unitary business, that reveals little about whether ASARCO was run as part of Bendix's unitary business. Nor can it be main-

tained that Bendix's shares of ASARCO stock, which it held for over two years, amounted to a short-term investment of working capital analogous to a bank account or certificate of deposit. See *Container Corp.*, 463 U.S., at 180, n. 19; *ASARCO*, 458 U.S., at 325, n. 21.

In sum, the agreed-upon facts make clear that under our precedents New Jersey was not permitted to include the gain realized on the sale of Bendix's ASARCO stock in the former's apportionable tax base.

The judgment of the New Jersey Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE, JUSTICE BLACKMUN, and JUSTICE THOMAS join, dissenting.

In my view, petitioner has not shown by "clear and cogent evidence" that its investment in ASARCO was not operationally related to the aerospace business petitioner conducted in New Jersey. *Exxon Corp.* v. *Department of Revenue of Wis.*, 447 U.S. 207, 221 (1980) (internal quotation marks omitted). Though I am largely in agreement with the Court's analysis, I part company on the application of it here.

I agree with the Court that we cannot adopt New Jersey's suggestion that the unitary business principle be replaced by a rule allowing a State to tax a proportionate share of all the income generated by any corporation doing business there. See *ante*, at 784. Were we to adopt a rule allowing taxation to depend upon corporate identity alone, as New Jersey suggests, the entire due process inquiry would become fictional, as the identities of corporations would fracture in a corporate shell game to avoid taxation. Under New Jersey's theory, for example, petitioner could avoid having its ASARCO investment taxed in New Jersey simply by establishing a separate subsidiary to hold those earnings outside New Jersey. A constitutional principle meant to ensure

that States tax only business activities they can reasonably claim to have helped support should depend on something more than manipulations of corporate structure. See *Mobil Oil Corp.* v. *Commissioner of Taxes of Vt.*, 445 U. S. 425, 440 (1980) ("[T]he form of business organization may have nothing to do with the underlying unity or diversity of business enterprise"); *Fargo* v. *Hart*, 193 U. S. 490 (1904) (refusing to find unitary business even though single owner); *Adams Express Co.* v. *Ohio State Auditor*, 165 U. S. 194, 222 (1897) (same).

New Jersey suggests that we should presume that all the holdings of a single corporation are mutually interdependent because common ownership will stabilize profits from the commonly held businesses, generating flows of value between them that make them part of a unity. While it may be true that many corporations attempt to diversify their holdings to avoid business cycles, we have refused to presume a flow of value into an in-state business from the potential benefits of being part of a larger multistate, multibusiness corporation. The reason for this is simple: Diversification may benefit the corporation as an entity without necessarily affecting the business activity in the taxing State and without requiring any support from the taxing State. See *Wisconsin* v. *J. C. Penney Co.*, 311 U. S. 435, 444 (1940) (State may not tax where it has not "given anything for which it can ask return").

I also agree with the Court that there need not be a unitary relationship between the underlying business of a taxpayer and the companies in which it invests in order for a State to tax investment income. See *ante*, at 787. "[A]ctive operational control" of the investment income payor by the taxpayer is certainly not required. *ASARCO Inc.* v. *Idaho Tax Comm'n*, 458 U. S. 307, 343 (1982) (O'CONNOR, J., dissenting). Insofar as a requirement that the investment payor and payee be unitary was suggested by our decisions in *ASARCO* and *F. W. Woolworth Co.* v. *Taxation and Reve-*

*nue Dept. of N. M.,* 458 U. S. 354 (1982), petitioner concedes that was a "doctrinal foot fault." Reply Brief for Petitioner on Reargument 4. Although a unitary relationship between the investment income payor and payee would suffice to relate the investment income to the in-state business, such a connection is not necessary. Taxation of investment income received from a nondomiciliary taxpayer's investment in another corporation requires only that the investment income be sufficiently related to the taxpayer's in-state business, not that the taxpayer's business and the corporation in which it invests be unitary. Only when the State seeks to tax directly the *income* of a nondomiciliary taxpayer's subsidiary or affiliate through combined reporting, see *Container Corp. of America* v. *Franchise Tax Bd.,* 463 U. S. 159, 169, and n. 7 (1983), must the underlying businesses of the taxpayer and its affiliate or subsidiary be unitary. In any case, the key question for purposes of due process is whether the income that the State seeks to tax is, by the time it is realized, sufficiently related to a unitary business, part of which operates in the taxing State.

In this connection, I agree with the Court that out-of-state investments serving an operational function in the nondomiciliary taxpayer's in-state business are sufficiently related to that business to be taxed. In particular, I agree that " 'interim uses of idle funds "accumulated for the future operation of [the taxpayer's] business [operation]," ' " may be taxed. *Ante,* at 787 (quoting *ASARCO, supra,* at 325, n. 21). The Court, however, leaves "operational function" largely undefined. I presume that the Court's test allows taxation in at least those circumstances in which it is allowed by the Uniform Division of Income for Tax Purposes Act (UDITPA). *Ante,* at 786. UDITPA counts as apportionable business income from "tangible and intangible property if the acquisition, management, and disposition of the property constitute *integral parts* of the taxpayer's regular trade or business operations." UDITPA § 1(a), 7A U. L. A. 336

(1985) (emphasis added). Presumably, investment income serves an operational function if it is, to give only some examples, intended to be used by the time it is realized for making the business' anticipated payments; for expanding or replacing plants and equipment; or for acquiring other unitary businesses that will serve the in-state business as stable sources of supply or demand, or that will generate economies of scale or savings in administration.

In its application of these principles to this case, however, I diverge from the Court's analysis. The Court explains that while "interest earned on short-term deposits in a bank located in another State" may be taxed "if that income forms part of the working capital of the corporation's unitary business," petitioner's longer term investment in ASARCO may not be taxed. *Ante,* at 787. The Court finds the investment here not to be operational because it was not analogous to a "short-term investment of working capital analogous to a bank account or certificate of deposit." *Ante,* at 790.

Any distinction between short-term and long-term investments cannot be of constitutional dimension. Whether an investment is short-term or long-term, what matters for due process purposes is whether the investment is operationally related to the in-state business. "The interim investment of retained earnings prior to their commitment to a major corporate project . . . merely recapitulates on a grander scale the short-term investment of working capital prior to its commitment to the daily financial needs of the company." *ASARCO, supra,* at 338 (O'CONNOR, J., dissenting). I see no distinction relevant to due process between investing in a company in order to build capital to acquire a second company related to the in-state business and, for example, "leas[ing] for a term of years the areas of [the taxpayer's] office buildings into which it intends ultimately to expand," which could hardly be claimed to set up a "separate and unrelated leasing business." 458 U. S., at 338, n. 6.

The link between the ASARCO investment here and the in-state business is closer than the Court suggests. It is not just that the ASARCO investment was made to benefit *Bendix* as a corporate entity. As the Court points out, any investment a corporation makes is intended to benefit the corporation in general. *Ante*, at 789. The proper question is rather: Was the income New Jersey seeks to tax intended to be used to benefit a unitary business of which Bendix's New Jersey operations were a part?

Petitioner has not carried the heavy burden of showing by clear and cogent evidence that the capital gains from ASARCO were not operationally related to its in-state business. See *Container Corp., supra,* at 175. Though this case comes to us on a stipulated record, there is no stipulation that the ASARCO capital gains were not intended to be used to benefit a unitary business, part of which operated in New Jersey. Instead, the record suggests that, by the time the capital gains were realized, at least some of the income was intended to be used in the attempt to acquire a corporation also engaged in the aerospace industry. App. 70–71, 81, 193. The acquisition of Martin Marietta, had it succeeded, would have been part of petitioner's unitary aerospace business, part of which operated in New Jersey. *Id.,* at 194. As the New Jersey Supreme Court found: "[T]he purpose of acquiring Martin Marietta was to complement the aerospace-electronics facets of Bendix business, some of which are located in New Jersey. . . . Even though the Martin Marietta takeover never came to fruition, the fact that it served as a goal for part of the capital generated by the sales of ASARCO . . . stock nurtures the premise that Bendix's ingrained policy of acquisitions and divestitures projected the existence of a unitary business." *Bendix Corp.* v. *Director, Div. of Taxation,* 125 N. J. 20, 38, 592 A. 2d 536, 545 (1991). We will, "if reasonably possible, defer to the judgment of state courts in deciding whether a particular set of activities constitutes a 'unitary business.'" *Container Corp., supra,*

at 175.   Because petitioner has failed to show by clear and cogent evidence that the income derived from the ASARCO investment was not related to the operations of its unitary aerospace business, part of which was in New Jersey, New Jersey should be able to apportion and tax that income.   As the Court holds that it may not, I must respectfully dissent.