## US BANCORP and SUBSIDIARIES
### *v.*
## DEPARTMENT OF REVENUE
### (TC 3422)

Carmen J. Santa Maria, Davis Wright Tremaine, Portland, represented plaintiffs.

James J. McLaughlin, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for plaintiffs rendered May 17, 1994.

**CARL N. BYERS, Judge.**

Plaintiffs appeal assessments of additional corporate excise tax and Multnomah County Business Income Tax for the years 1984 through 1987. The assessments are based upon determinations by defendant's auditor as to (1) when certain subsidiaries became part of plaintiffs' unitary group; and (2) the classification of certain dividends and capital gains as nonbusiness income. In compliance with the statutory requirement that plaintiffs exhaust their administrative remedies, plaintiffs appealed to defendant. ORS 305.275(4).[1] Defendant did not rule on plaintiffs' petition within nine months and plaintiffs elected to treat the petition as denied by filing this appeal. ORS 305.560(5).

## ISSUES

1. Whether dividends and capital gains realized by plaintiffs were "business" or "nonbusiness" income.

2. Whether plaintiffs and two newly acquired subsidiaries were unitary on or near the date of acquisition.

---

[1] All references to Oregon Revised Statutes are to the 1985 Replacement Part.

## TAX TREATMENT OF DIVIDENDS
## AND CAPITAL GAINS

US Bancorp (Bancorp), the parent, is an Oregon corporation which was organized in 1968 to participate in banking and related businesses. Its principal subsidiary is United States National Bank (USNB), a large commercial banking system in Oregon over 100 years old. During the years at issue Bancorp had a number of other subsidiaries and acquired additional subsidiaries.[2]

In the early 1980's, Bancorp sought to expand its banking business into the state of Washington by acquiring existing banks. It identified Old National Bank (ONB), a full service bank in Washington, and its holding company, Old National Bancorp (ONBC), as candidates for acquisition. Although ONBC was significantly smaller than Bancorp, its structure and operations were similar. More importantly, ONBC was in financial trouble. It had lost $14.8 million in 1982 and was in violation of Federal Reserve guidelines.

In 1983 Bancorp proposed a merger with ONBC. Although well aware that Washington law prohibited such a merger, Bancorp anticipated a change in the law. Bancorp formed a Washington subsidiary and proposed a "stakeout" transaction which would facilitate a merger when the law changed.

Under the terms of the "stakeout" transaction, Bancorp purchased the maximum amount of ONBC common stock allowed by Washington law (4.99 percent). Bancorp also purchased all the shares of a new class of preferred stock issued by ONBC. The preferred stock came with detachable warrants giving Bancorp the right to purchase another 20 percent of the common stock of ONBC. In addition, Bancorp extended a $20 million line of credit to ONBC and agreed to loan it another $10 million if necessary.

After the stakeout transaction was completed, ONBC's fortunes quickly reversed and it became profitable. In fact, it became so profitable it paid dividends to plaintiffs as follows:

---

[2] The combined Oregon excise tax returns show 32 subsidiaries in 1984 and 48 in 1987.

| Year | Amount |
|------|--------|
| 1984 | $360,000 |
| 1985 | $1,172,000 |
| 1986 | $2,559,900 |
| 1987 | $38,371 |

In view of its success, ONBC determined to find a better merger offer than the one Bancorp proposed. Accordingly, it redeemed all of Bancorp's preferred stock for $5,493,641. However, Bancorp retained the detachable warrants, thereby discouraging others from pursuing a merger.[3] Unable to locate any other suitable merger partner, ONBC agreed to merge with Bancorp. The Washington law prohibiting the merger was changed July 1, 1987, and on the same day, Bancorp and ONBC merged.

Plaintiffs reported the dividends and the gain from the sale of the preferred stock as business income, apportionable between Oregon and the other states where plaintiffs engaged in business. Defendant contends the dividends and gain were nonbusiness income allocable only to Oregon.

Oregon adopted the Uniform Division of Income for Tax Purposes Act (UDITPA) for taxpayers doing business interstate. That act expressly excludes financial organizations and public utilities from its provisions, and directs that the income of financial organizations is to be reported as provided in ORS 314.280 and 314.675. ORS 314.615.

ORS 314.280 provides:

"(1) If a taxpayer has income from business activity as a financial organization or as a public utility (as defined respectively in ORS 314.610(4) and (6)) which is taxable both within and without this state (as defined in ORS 314.610(8) and 314.615), the determination of net income shall be based upon the business activity within the state, * * * so as fairly and accurately to reflect the net income of the business done within the state.

"(2) The provisions of subsection (1) of this section * * * are designed to allocate to the State of Oregon on a fair and equitable basis a proportion of such income earned from sources both within and without the state."

---

[3] These warrants entitled Bancorp to purchase an additional 20 percent of the common stock of ONBC for $11 per share when the market value of the shares was $40.

Thus, it is necessary to evaluate the nature of plaintiffs' business for two reasons: (1) To determine if plaintiffs are financial organizations whose income is to be apportioned under ORS 314.280; and if they are, (2) to determine whether the income is business income or nonbusiness income.

ORS 314.610(4) defines financial organization to be:

"[A]ny bank, trust company, savings bank, industrial bank, land bank, safe deposit company, private banker, savings and loan association, credit union, cooperative bank, investment company, or any type of insurance company."[4]

■ Bancorp qualifies as a financial organization under ORS 314.610(4) as either a bank or an investment company. All of Bancorp's subsidiaries engaging in investment, insurance, and banking are also financial organizations under the same definition. The court finds that the dominant business activities of the unitary group are banking and financial services. Therefore, the apportionment of plaintiffs' income is governed by ORS 314.280. That statute specifies that the determination of net income is to be based on business activity within the state. ORS 314.280(1).

■ Having determined that plaintiffs are financial organizations, the question is whether the purchase, holding and sale of ONBC preferred stock were transactions and activities in the regular course of plaintiffs' trade or business. The determination of what constitutes a "business activity" and "business" or "nonbusiness" income must be made in light of defendant's rules.

" 'Business activity' refers to the transactions and activity occurring in the regular course of a particular trade or business of a taxpayer." OAR 150-314.610(1)-(A)(4) adopted by reference in OAR 150-314.280-(B).

"ORS 314.610(1) defines 'business income' as: Income arising from transactions and activities in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, use or rental, and disposition of the property constitute

---

[4] One question which has not been addressed by the parties is: "Who is the taxpayer?" UDITPA and ORS 314.280 are written in terms that suggest a single taxpayer but plaintiffs have filed a combined return as a unitary business. The business activities of a unitary conglomerate may be much broader than the business activities of any single corporation.

integral parts of the taxpayer's regular trade or business operations. In essence, all income which arises from the conduct of trade or business operations of a taxpayer is business income. For purposes of administration of ORS 314.605 to 314.670, the income of the taxpayer is business income unless clearly classifiable as nonbusiness income under ORS 314.605 to 314.670 and the rules thereunder." OAR 150-314.610(1)-(A).

"Any activity undertaken by a taxpayer within or outside of Oregon during the taxing period for the purpose of aiding in the taxpayer's endeavor to obtain an ultimate profit or gain is considered a business activity, whether or not the activity secures an actual net profit during the tax period." OAR 150-314.610(1)-(A)(4).

Defendant's rules recognize that labels such as dividends, rents or royalties are not helpful in determining whether income is business or nonbusiness income. OAR 150-314.610(1)-(B) states:

"Accordingly, the critical element in determining whether income is 'business income' or 'nonbusiness income' is the identification of the transactions and activity which are the elements of a particular trade or business. In general, all transactions and activities of the taxpayer which are dependent upon or contribute to the operations of the taxpayer's economic enterprise as a whole constitute the taxpayer's trade or business and will be transactions and activity arising in the regular course of, and will constitute integral parts of, a trade or business."

Plaintiffs argue that Bancorp's corporate purpose is investing and its regular business activities consist of buying and selling securities and receiving dividends.

Defendant contends that plaintiffs' regular business is to "completely own" and operate subsidiaries, suggesting that anything less is an extraordinary transaction. The court finds that the elements of Bancorp's business is buying, holding and selling investments, particularly those related to banking. The holding and sale of ONBC preferred stock was in the regular course of Bancorp's business activities. In addition, its dominant position as an activity of the unitary group also supports finding that buying, holding and selling securities of other banks is a regular activity of the unitary business.

Defendant contends that plaintiffs' position is the same as those positions rejected by the United States Supreme Court in *Asarco Inc. v. Idaho State Tax Comm'n*, 458 US 307, 102 S Ct 3103, 73 L Ed 2d 787 (1982), *F. W. Woolworth Co. v. Taxation & Rev. Dept.*, 458 US 354, 102 S Ct 3128, 73 L Ed 2d 819 (1982), and *Allied Signal v. Director, Tax Div.*, 504 US 768, 112 S Ct 2251, 119 L Ed 2d 533 (1992).

■    Cases such as *Asarco* and *Allied Signal* address constitutional limits on a state's taxing power. Oregon's statutes and administrative rules are not limited in their perspective to constitutional limitations. As this court noted in *Maytag Corp. v. Dept. of Rev.*, 12 OTR 502 (1993), Oregon statutes appear intended to tax nondomiciliary businesses to the full extent permitted by the constitution. The statutes, however, apply to both domiciliary and nondomiciliary businesses. Consequently, the statutes and rules are like the proverbial two-edged sword which cuts both ways. If a broadly worded state statute provides for apportionment of a taxpayer's income, it applies even though it results in less revenue for the state. Because the Supreme Court decisions are limitations overlaying Oregon's apportionment statutes, it is appropriate to review the constitutional standards for determining business versus nonbusiness income.

The underlying principles were expressly addressed in *Allied Signal v. Director, Tax Div.*:

"As these cases make clear, the unitary business rule is a recognition of two imperatives: The States' wide authority to devise formulae for an accurate assessment of a corporation's intrastate value or income; and the necessary limit on the States' authority to tax value or income which cannot in fairness be attributed to the taxpayer's activities within the State." 504 US 768 at 780, 112 S Ct at 2259, 119 L Ed 2d at 547.

Although the Court in *Mobil Oil Corp. v. Comm. of Taxes*, 445 US 425, 100 S Ct 1223, 63 L Ed 2d 510 (1980), seemed to indicate that a unitary relation had to exist between the payee and the payor, this point was clarified in *Allied Signal*. The Court there stated:

"We agree that the payee and the payor need not be engaged in the same unitary business as a prerequisite to apportionment in all cases. *Container Corp.* says as much.

What is required instead is that the capital transaction serve an operational rather than an investment function." 504 US at 787, 112 S Ct at 2263, 119 L Ed 2d at 552 (citation omitted).

The Court goes on to indicate that a unitary relation is only one basis for justifying apportionment. The Court gives the example that interest earned on short-term deposits is apportionable business income if that income forms part of the working capital of the unitary business.

Looking at the issue from the taxpayer's perspective, the Court indicated that:

"It remains the case that '[i]n order to exclude certain income from the apportionment formula, the company must prove that "the income was earned in the course of activities unrelated to [those carried out in the taxing] state." ' " *Id., quoting Exxon Corp. v. Wisconsin Dept. of Rev.*, 447 US 207, 223, 100 S Ct 2109, 65 L Ed 2d 66 (1980).

■ In making the distinction between capital transactions which serve an investment function and those which serve an operational function, the Court, in *Allied Signal,* cited *Container Corp. v. Franchise Tax Board,* 463 US 159, 103 S Ct 2933, 77 L Ed 2d 545 (1983). The Court in that case noted:

"When a corporation invests in a subsidiary that engages in the same line of work as itself, it becomes much more likely that one function of the investment is to make better use—either through economies of scale or operational integration or sharing of expertise—of the parent's existing business-related resources." 463 US at 178.

Under both the state statute and the U. S. Supreme Court cases, plaintiffs' investment in the preferred stock of ONBC served an operational function as opposed to an investment function.

Defendant argues that Bancorp did not want an investment; rather:

"USBC wanted a bank, not a bank holding company. The reality is that USBC's business is banking, not investing * * *."

■ In some ways, defendant's argument merely makes plaintiffs' position stronger. Plaintiffs' unitary business is a

collection of banking and banking-related businesses. Bancorp's regular activity seeks to acquire and dispose of elements of that unitary group. The stakeout transaction was consistent with Bancorp's regular business activities of acquiring interests for expansion. It is important to note that the purchase of the stock was not just an "investment." It was structured to provide Bancorp with ownership opportunities when they became possible. Also, it involved more than just the purchase of stock. Bancorp extended a $20 million line of credit backed with an agreement to loan UNBC an additional $10 million if necessary. The nature of the transaction was such that Bancorp was not just investing its capital in a passive investment. Its stock purchase and loans were designed to result in additional banking subsidiaries.

Defendant's rule states:

"Dividends are business income where the stock with respect to which the dividends are received arises out of or was acquired in the regular course of the taxpayer's trade or business operations or where the purpose for acquiring and holding the stock is related to or incidental to such trade or business operation." OAR 150-314.610(1)-(B)(4).

Defendant contends the dividends and gain from the stock are "indistinguishable" from the long-term securities found to be nonapportionable in *Sperry & Hutchinson v. Dept. of Rev.*, 270 Or 329, 527 P 2d 729 (1974). However, in *Sperry & Hutchinson,* the business of the company was the sale of trading stamp promotional services. There was no suggestion in that case that acquiring long-term securities related in any way to the corporate purposes or to the business conducted.

Unlike *Sperry & Hutchinson,* plaintiffs' business activities, which include investing, holding and disposing of banking-related assets, is consistent with Bancorp's corporate purpose. It is similar to the situation where the business acquires stock to obtain a source of supply of materials (OAR 150-314.610(1)-(B)(4) example (iii)) or acquires other property to facilitate its business operations.

The fact that plaintiffs are domiciled in Oregon does not affect the test to be applied. If plaintiffs were a non-domiciliary business, the dividend and capital gains income would still be business income.

## INTEGRATION OF ONBC INTO A UNITARY GROUP

The second major issue in this case is when did ONBC become unitary with plaintiffs?

The merger negotiations between Bancorp and ONBC were renewed in late 1986. Early in 1987, merger committees were formed by each corporation to work out the particular problems of the merger. Although it was not possible to merge before July 1, 1987, the parties anticipated the law would be changed, and that date became the target date for the merger.

In seeking the merger, Bancorp wanted to acquire a customer base, a branch network, and account portfolios. It realized there would be some duplication in areas such as administrative support, facilities, and personnel. The purpose of the merger committees was to explore cost savings and to facilitate integration of both systems.

Effective July 1, 1987, the law was changed and the merger occurred. Other ONBC shareholders were paid for their stock, leaving plaintiffs with 100 percent of ONBC. As of that date, the ONBC management team "disappeared." Bancorp took control of all ONBC operations. Almost immediately, the following administrative services were centralized: financial management, public affairs, investment portfolio management, auditing, purchasing and supply, printing, personnel, legal, data processing, general ledger and insurance sales. Lines of credit from plaintiffs were made available to ONBC.

Plaintiffs contend that the companies were "unitary on or near the date of merger," and therefore are entitled to file combined returns.

Defendant contends that plaintiffs were not unitary until some time later. Defendant argues: (1) there were no real savings until 1988; (2) separate executives remained in human resources, data processing and mortgage departments; (3) payrolls were not integrated until January 1, 1988; (4) fringe benefits were not integrated until January 1, 1988; and (5) the general ledgers were not consolidated for almost a year. Defendant also points out that credit policies and accounting functions for trusts, purchasing and legal were not

effective until after July 1, 1987. In addition, mainframe computer systems, bank cards, training for personnel, and loan system, checking accounts, savings and time deposits were not integrated as of November or December of 1987.

■ However, the test under ORS 317.710 is not whether the businesses were fully integrated but whether they were unitary.

ORS 317.705 provides in part:

"(2) 'Unitary group' means a corporation or group of corporations engaged in business activities that constitute a single trade or business.

"(3)(a) 'Single trade or business' means a business enterprise in which there exists directly or indirectly between the members or parts of the enterprise a sharing or exchange of value as demonstrated by:

"(A) Centralized management or a common executive force;

"(B) Centralized administrative services or functions resulting in economies of scale; and

"(C) Flow of goods, capital resources or services demonstrating functional integration.

"(b) 'Single trade or business' may include, but is not limited to, a business enterprise the activities of which:

"(A) Are in the same general line of business (such as manufacturing, wholesaling or retailing); or

"(B) Constitute steps in a vertically integrated process (such as the steps involved in the production of natural resources, which might include exploration, mining, refining and marketing)."

■ As this court recently held:

"Determining whether a business is unitary is based on whether:

" '[C]ontributions to the income [of the subsidiaries] result[ed] from functional integration, centralization of management and economies of scale.' " *Maytag Corp. v. Dept. of Rev.*, 12 OTR 502, 507 (1993) (citations omitted).

■ The court finds that on or near July 1, 1987, ONBC and its subsidiaries were in the same general business as

Bancorp and its subsidiaries and that such business constituted a single trade or business. The single trade or business existed because there was a sharing or exchange of value directly between the members by virtue of centralization of some administrative services and a flow of capital resources. Plaintiffs' size and financial strength immediately created a flow of value to ONBC. For banks and other financially oriented businesses, the amount of capital resources available has many ramifications. When two financial institutions are combined, it would be extraordinary if there were not synergistic benefits to each of them. In this case, with the merger, ONBC had increased credit lines which enabled it to meet the needs of larger corporate businesses. This has the potential for increasing market shares as well as profits. The combining of the two financial groups had other immediate ramifications. For example, the increased financial strength resulted in a "savings of over $1 million a year" in insurance premiums. Bancorp was now able to reach into markets previously barred and its capital resources could be employed through ONBC to exploit new opportunities and growth. It is precisely this type of flow of value which justifies taxing affiliated businesses as a unit.

The arguments defendant makes with regard to ONBC and Valley National Corporation (VNC) may well apply to some of plaintiffs' existing subsidiaries which defendant acknowledges are part of the unitary group. There may be a duplication of services and facilities resulting in additional costs rather than cost savings and there may be differences in administrative policies, personnel and trade practices. However, none of these factors prevent affiliated corporations from being treated as a single trade or business. Rather, the statute looks to whether there are sufficient core connections which make it appropriate to treat the businesses as a single unit rather than try to obtain accurate separate accounting.

The above analysis with regard to ONBC holds true for Valley National Corporation (VNC) as well. Beginning on May 31, 1987, VNC was subjected to the strong centralized management of Bancorp, benefited from Bancorp's greater financial resources and benefited from centralized administrative services and functions. The interconnections between

ONBC, VNC and Bancorp were sufficient that if Bancorp were a nondomiciliary corporation it, and its subsidiaries, would have been taxable in Oregon as a unitary business beginning with the date of merger in 1987.

In conclusion, the court finds that plaintiffs' dividend income and capital gain income realized from the sale of the preferred stock of Old National Bancorp was business income apportionable under ORS 314.280. Also, ONBC and VNC were unitary with Bancorp on or near the date of merger and plaintiffs' are permitted to file a combined return for 1987. Plaintiffs to recover costs and disbursements.