## INTERNATIONAL PAPER COMPANY *v.* COMMISSIONER OF REVENUE SERVICES

SUPERIOR COURT     JUDICIAL DISTRICT OF     FILE No. 312263S
HARTFORD-NEW BRITAIN AT HARTFORD

Memorandum filed October 15, 1992

*Cummings & Lockwood,* for the plaintiff.

*Richard K. Greenberg* and *Carl F. Yeich,* assistant attorneys general, and *Richard Blumenthal,* attorney general, for the defendant.

HON. ROBERT SATTER, STATE TRIAL REFEREE. In this appeal, brought pursuant to General Statutes § 12-237, the plaintiff, International Paper Company (International) contests an assessment levied against it by the defendant commissioner of revenue services (commissioner) in the amount of $355,297,[1] plus interest, for unpaid corporation business taxes for 1981 and 1982.

The basis of the assessment is International's failure to include as taxable income for the two years the capital gains and interest realized from sales of the stock of a wholly owned subsidiary, Canadian International Paper (Canadian), and of the stock of a company in which it held a 14.4 percent interest, called C. R. Bard, Inc. (Bard).

As a New York corporation doing business in Connecticut, International is required to apportion its net income to determine the amount subject to the Connecticut corporation business tax in accordance with the formula in General Statutes § 12-218. International

---

[1] The total assessment was $370,285, but $14,988 is not contested in this appeal.

contends that apportionment of the income derived from the sales of the aforementioned stocks violates the due process and commerce clauses of the constitution of the United States.

When contesting the commissioner's assessment, International asserted these constitutional claims. In denying the claims, the deputy commissioner said: "The challenge raised by you as to the constitutionality of this particular section of the General Statutes [§ 12-218] is not a question of fact to be heard by the Department of Revenue Services. The Department of Revenue Services is not the proper forum to determine the constitutionality of the General Statutes of the State of Connecticut."

The parties have agreed to a lengthy stipulation of facts. Extensive exhibits have been appended. The court did not hear any evidence at the hearing on this appeal.

While states have broad powers to tax, those powers are limited, at least as to multistate corporations, by the due process and commerce clauses of the constitution of the United States. The underlying reason for the commerce clause limitation is that to subject such corporations to unrestrained multiple state taxation would have drastic consequences for the national economy. *Allied-Signal, Inc.* v. *Director, Division of Taxation,* 504 U.S. 768, 777–78, 112 S. Ct. 2251, 119 L. Ed. 2d 533 (1992). The underlying reason for the due process clause limitation is that fairness dictates that there be "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax." *Miller Bros. Co.* v. *Maryland,* 347 U.S. 340, 344–45, 74 S. Ct. 535, 98 L. Ed. 744 (1954). The basic principle that emerges is that the state's power to tax is justified by the "protection, opportunities and benefits" the state confers on the taxpayer's

activities within the state. *Allied-Signal, Inc.* v. *Director, Division of Taxation,* supra, 778; *Wisconsin* v. *J. C. Penney Co.,* 311 U.S. 435, 444, 61 S. Ct. 246, 85 L. Ed. 267 (1940).

The due process clause imposes two requirements on the state's right to tax income generated in interstate commerce: " '[A] minimal connection' between the interstate activities and the taxing State, and a rational relationship between the income attributed to the State and the intrastate values of the enterprise." *Mobil Oil Corporation* v. *Commissioner of Taxes,* 445 U.S. 425, 436–37, 100 S. Ct. 1223, 63 L. Ed. 2d 510 (1980). The requisite connection or nexus is supplied by the corporation availing itself of the substantial privilege of doing business within the state, or maintaining an office there. Id., 437; *Wisconsin* v. *J. C. Penney Co.,* supra. The rational relationship between income attributed to the state and the intrastate values of the enterprise is achieved by a formula that apportions a corporation's total income on the basis of its property, payroll and sales receipts within a state to its total of those factors everywhere. The constitutionality of this method of apportionment has long been upheld. *Container Corporation of America* v. *Franchise Tax Board,* 463 U.S. 159, 165, 103 S. Ct. 2933, 77 L. Ed. 2d 545, reh. denied, 464 U.S. 909, 104 S. Ct. 265, 78 L. Ed. 2d 248 (1983); *Hans Rees' Sons, Inc.* v. *North Carolina ex rel. Maxwell,* 283 U.S. 123, 51 S. Ct. 385, 75 L. Ed. 879 (1931); *Underwood Typewriter Co.* v. *Chamberlain,* 254 U.S. 113, 41 S. Ct. 283, 65 L. Ed. 165 (1920). That method of apportionment is also embodied in the Uniform Division of Income for Tax Purposes Act, adopted by the great majority of states.

The "linchpin" for including the dividends or capital gains realized from the sale of the stock of a subsidiary corporation in the apportionable income of the parent is the unitary business principle. "So long as

dividends from subsidiaries and affiliates reflect profits derived from a functionally integrated enterprise, those dividends are income to the parent earned in a unitary business." *Mobil Oil Corporation* v. *Commissioner of Taxes,* supra, 440. To establish that the dividends or capital gains are not subject to the apportioned tax, the taxpayer must show the subsidiary was engaged in a "discrete business." *Exxon Corporation* v. *Wisconsin Department of Revenue,* 447 U.S. 207, 224, 100 S. Ct. 2109, 65 L. Ed. 2d 66 (1980).

Among the criteria of a unitary business enterprise are functional integration, centralization of management, and economies of scale. *Container Corporation of America* v. *Franchise Tax Board,* supra, 179; *F. W. Woolworth Co.* v. *Taxation & Revenue Department,* 458 U.S. 354, 371, 102 S. Ct. 3128, 73 L. Ed. 2d 819 (1981); *Mobil Oil Corporation* v. *Commissioner of Taxes,* supra, 438. The application of the unitary business principle to a particular case is "fact sensitive"; *Allied-Signal, Inc.* v. *Director, Division of Taxation,* supra, 785; and regard is paid to the "underlying economic realities." *Exxon Corporation* v. *Wisconsin Department of Revenue,* supra, 223.

In *Exxon Corporation* v. *Wisconsin Department of Revenue,* supra, 224, the United States Supreme Court found that Exxon was "a highly integrated business which benefits from an umbrella of centralized management and controlled interaction." Its internal accounting techniques of dividing its functions of exploration, production, refining and marketing of petroleum into separate departments were held not to be binding on the state of Wisconsin in imposing an apportioned tax on the total income of the corporation.

In *Mobil Oil Corporation* v. *Commissioner of Taxes,* supra, 435, the court similarly upheld the inclusion of Mobil's dividends from subsidiaries and affiliates abroad

in the income apportionable in determining the Vermont corporate income tax on the ground that these subsidiaries and affiliates "engage in business activities that form part of Mobil's integrated petroleum enterprise."

In *Container Corporation of America* v. *Franchise Tax Board,* supra, 179, the court found Container and its subsidiaries constituted a unitary business based upon Container assisting its subsidiaries in obtaining new and used equipment, filling personnel needs, loaning funds to its subsidiaries and guaranteeing loans made by others.

On the other hand, in *Asarco Inc.* v. *Idaho State Tax Commissioner,* 458 U.S. 307, 102 S. Ct. 3103, 73 L. Ed. 2d 787 (1982), the court held that while Asarco operated a silver mine in Idaho, that state could not tax the income Asarco realized from a Peruvian mining subsidiary. The court noted that although the Peruvian subsidiary sold 35 percent of its output to Asarco at market prices, and six of its thirteen directors were appointed by Asarco, a management contract between the two companies ensured that Asarco would not control the subsidiary, and the trial court found that the subsidiary operated independently. Consequently, the court concluded that the two businesses were "insufficiently connected to permit the two companies to be classified as a unitary business." Id., 322.

In *F. W. Woolworth Co.* v. *Taxation & Revenue Department,* supra, although Woolworth owned all the stocks of three of its foreign subsidiaries and the majority of the stocks of the fourth and Woolworth had the potential authority to control them, in fact, it did not exercise that authority but the subsidiaries acted autonomously as to merchandising, site selection, advertising, accounting, warehousing and personnel training. Also, while a decision as to the subsidiaries

declaring dividends and incurring debt had to be approved by Woolworth, these were the type of oversights "that any parent gives to an investment in a subsidiary . . . ." Id., 369. Distinguishing a retail merchandising business from a multinational petroleum enterprise, such as Exxon, the court found "no integration of the business activities or centralization of the management," to justify New Mexico including the income of the subsidiaries in the calculation of Woolworth's apportioned income subject to the corporate tax. Id.

Finally, in *Allied-Signal, Inc.* v. *Director, Division of Taxation,* supra, the issue was whether New Jersey could tax the capital gains Bendix Corporation (the predecessor to Allied-Signal, Inc.) realized from the sale of its 20.6 percent stock interest in Asarco, Inc. The court noted Bendix was engaged in the development and manufacture of aerospace products and Asarco in the production of nonferrous metals. It further noted that there was no common management or officers of Bendix and Asarco, no use by Asarco of Bendix facilities, no sale of products between the two companies, no sharing of accounting, legal or finance services, no lending of money, guarantees of loans or joint borrowing, no transfer of employees between Bendix and Asarco, and that Bendix exerted no control over Asarco. On these facts, the court concluded that Asarco was a discreet business entity so that the gain by Bendix on the sale of Asarco stock could not be taxed as part of its apportioned income. The court also emphasized the distinction between the income realized from the acquisition of the stock of another company for investment purposes, which was not taxable, and income realized from the acquisition of such stock for operational purposes which, if it resulted in functional integration, centralized management and economies of scale, was taxable.

It now becomes necessary to apply the holdings of these cases and the principles they stand for to the facts of the present case.

In 1981 and 1982, International, a New York corporation with its principal office in Purchase, New York, transacted business in most of the states of the United States, including Connecticut, and in foreign countries. It owned and operated a manufacturing plant in Putnam, Connecticut and had a sales office in Norwalk, Connecticut.

In 1898, International acquired the St. Maurice Lumber Company, a New York corporation, which owned, among other assets, timberlands and crown land licenses in Canada. In 1916, the St. Maurice Lumber Company reincorporated under the laws of the province of Quebec, and, in 1925, changed its name to the Canadian International Paper Company (Canadian). From 1916 on, International owned beneficially and of record, 100 percent of the issued and outstanding shares of Canadian.

In October, 1981, International sold all of its Canadian shares to Portemiac Paper for $896 million, payable partly in 1981 and partly in 1982. International realized a capital gain of $185,277,710 and interest income on the installment sale of $23,217,715 in 1981 and a capital gain of $349,250,270 and interest income of $1,032,855 in 1982, which it reported on its federal income tax returns for those years. It did not report these incomes on its Connecticut corporate business tax returns. The commissioner apportioned these incomes, pursuant to § 12-218, and assessed International $353,703 for taxes due in 1981 and 1982.

International, as its 1980 annual report to its stockholders proclaimed, "had worldwide sales of $5 billion" making "it one of the largest industrial companies in the United States. [International] is the leading

manufacturer in a number of pulp, paper and packaging product lines. The company is also a major producer of lumber and plywood.''

International and its predecessor company, at or around the turn of the century, produced approximately 60 percent of the newsprint (paper used for newspapers) sold in the United States. Gradually, as a result of its acquisition of Canadian and the greater abundance of Canadian timberland, more and more of the production of newsprint concentrated in Canada. During 1979, 1980 and 1981, Canadian's consolidated production of newsprint represented 80 percent of International's total consolidated production of newsprint, and International's total consolidated production of newsprint in the United States accounted for the other 20 percent.

During 1979, 1980 and 1981, the consolidated sales of Canadian and its subsidiaries were distributed among its product lines in the following proportions: pulp and paper (including newsprint, paper and specialty pulps)—65 percent; packaging products (including container board and bleached packaging board)—22.3 percent; other paper products (including tissue, diapers and napkins)—14 percent.

In that same period the consolidated sales of International and its subsidiaries (other than Canadian) were distributed among its product lines in the following proportions: pulp and paper—33 percent; packaging products—49 percent; wood products and resources (including lumber, plywood, wood chips and treated poles)—20 percent; other products—3 percent.

In that same period the relationship of consolidated sales of Canadian and subsidiaries to consolidated sales of International was 19.9 percent in 1979, 20.7 percent in 1980 and 21.2 percent in 1981. The relationship of consolidated net earnings of Canadian and subsidiaries

to consolidated net earnings of International was 14.7 percent in 1979, 25.3 percent in 1980 and 11 percent in 1981 through September 30, 1981.

During 1981 and 1982 and prior thereto, Canadian retained considerable autonomy in its operations. It had its own legal and accounting staffs, although International's inside patent counsel consulted with Canadian's outside patent counsel, and International's inside tax staff advised Canadian on United States federal, state and local taxes and on the tax ramifications of the amount and timing of Canadian's dividend payments. Canadian maintained its own research department and separate research facilities, although both Canadian and International shared research results and for a fee Canadian conducted research on International's projects. Canadian had its own insurance for its operations, except that its officers and directors were covered by International's directors and officers liability insurance policy.

Canadian and International shared no office space, manufacturing or warehousing facilities, machinery, equipment or computers, except that a Canadian subsidiary, International Paper Sales Company, leased office space from International in the United States and International and Canadian each owned a conference center, which was rented to the other for a fee.

Canadian and International undertook no shared or joint purchasing, common marketing or advertising.

Canadian had complete autonomy as to capital expenditures of less than one million dollars; capital expenditures of between one and five million dollars were subject to the approval of International's chairman and vice-chairman; capital expenditures over five million dollars were subject to extensive review by International and to approval by International's board of directors.

Canadian maintained its own corporate policy guide on a variety of subjects such as ethical business conduct, conflicts of interest and employment policies.

Canadian had its own banking arrangements and owed International an outstanding loan and accounts receivable in minor amounts, but there was no other indebtedness or guarantee of loans between the two corporations.

On the other hand, the interrelationships between Canadian and International were considerable. While, as expected, the board of directors of Canadian was elected by International, its sole stockholder, the chairman and vice-chairman of the board of Canadian were also the chairman and vice-chairman of the board of International. While there were only eight personnel transfers between the two corporations, they all involved top management positions. It is significant that in 1971, a senior vice-president and chief financial officer of International became president and chief executive officer of Canadian and, in 1972, another officer of International became president and chief executive officer of Canadian, positions he has held continuously to date.

Canadian and International sold relatively minor amounts of their products to each other at competitive prices during 1979 through 1981. An International subsidiary, International Pulp Sales Company, however, was the exclusive worldwide distributor (except in Canada, Cuba and China) of pulp produced by Canadian and its subsidiaries. A Canadian subsidiary, International Paper Sales Company, was the distributor of Canadian's newsprint worldwide and of International's newsprint in the United States. An International subsidiary provided marine transport of Canadian newsprint from Canada to the United Kingdom.

The organizational chart of International shows that the line of authority ran from the president of International to three executive vice-presidents, each in charge of a main corporate group of International. One of these three groups was "the international and wood products businesses," of which Canadian was a part. The executive vice-president of International had general oversight responsibilities of Canadian, and the line of authority ran from him to the president of Canadian. Canadian's president and other officers made periodic visits to International's corporate headquarters to report on specific matters.

International issued a corporate policy guide, intended to be statements of principles supplying "general limits and direction in which managerial action will take place, in areas where consistency and continuity are necessary to accomplish corporate objectives." The guide applied to all International subsidiaries, and, therefore, to Canadian. Deviation from it was permitted only "where local statute or practice may require it." The statement of policy in the guide covered a broad range of topics of corporate-wide importance, such as internal auditing, capital and repair project approvals, forest land management, patents, management development, hiring of consultants and independent public accountants, environment and human resources. Canadian's policy guide covered less weighty corporate matters, and in the event of conflict, clearly was subsidiary to International's guide.

International's annual reports to its stockholders stressed International's image as a "worldwide enterprise," "one of the world's largest natural resource management companies," ranking as the "largest industrial owner of timberland in North America." All references to "International" or "the company" included its subsidiaries, i.e., Canadian. The 1980 annual report specifically states that among Interna-

tional's extensive holdings of timberland in North America, 1.4 million acres were in Canada, clearly meaning those of Canadian.

A theme appearing in International's annual reports is that Canadian functioned as International's newsprint "group." Canadian's newsprint production accounted for 80 percent of International's consolidated newsprint production and 35 percent of International's consolidated pulp and paper production. The 1980 annual report states: "Modernization projects are underway in [International's] newsprint production system, 80% of which is in Canada." That same report states further: "Canadian International Paper's packaging business had a record year. Healthy export sales offset a downturn in the Canadian market at mid-year as the recession spread into Canada."

Annual reports also emphasize International's company research program. One of the important research facilities referred to is the one operated by Canadian in Hawkesbury, Ontario, which was credited with "developing processes and technologies which are applied throughout [Canadian] and [International]." As stated in International's 1973 annual report: "[International's] research center at Sterling Forest, N.Y.; Mobile, Ala.; and Bainbridge, Ga., *together* with *the [Canadian] facility in Hawkesbury, Ontario, Canada,* make up the most comprehensive research activity in the forest products industry." (Emphasis added.)

A research and development agreement between International and Canadian, dated December 1, 1979, required International to subsidize Canadian's general research, also required Canadian to undertake, for a fee, specific projects for International and to disclose to International all research results, subject to third party confidences.

Other oversight and supervision International exercised over Canadian included: (1) International's director of corporate strategic planning coordinated the long-range planning for all of International's business units, including Canadian, and Canadian was required to submit its strategic plan annually to International; (2) International's assistant corporate controller reviewed Canadian's proposed capital projects of over five million dollars from the financial perspective, International's other officers reviewed them from the functional and technical perspectives, and International's board of directors ultimately voted on whether to approve such projects.

On balance, this court concludes that while Canadian exercised considerable autonomy in its operations, it did not constitute a "discrete business" within the meaning of the United States Supreme Court cases discussed above. Rather, this court concludes, on the basis of the considerable interconnected links between International and Canadian and the considerable oversight and control International exercised over Canadian, that there was such substantial functional integration, centralization of management and economies of scale as to render these companies integral parts of a unitary business. Their unified operations in the paper and lumber industry made them akin to "Mobil's integrated petroleum enterprise"; *Mobil Oil Corporation* v. *Commissioner of Taxes,* supra, 435; or Exxon's "highly integrated business which benefits from an umbrella of centralized management and controlled interaction." *Exxon Corporation* v. *Wisconsin, Department of Revenue,* supra, 224. As a consequence, the capital gain and interest International realized from the sale of Canadian's stock was properly apportionable as a part of International's corporate income for the years in question, pursuant to § 12-218, and properly subject to the Connecticut corporation business tax.

On November 1, 1968, International acquired 702,000 shares of the common stock of Bard in connection with International's purchase of the stock of the Davol Corporation, the assets of which included the Bard stock. In 1972, Bard declared a two for one stock split of its common stock, increasing International's holdings of that stock to 1,404,000 shares representing 14.4 percent of the issued and outstanding shares of Bard stock.

On September 22, 1982, International sold 148,078 Bard shares, realizing a pretax gain of $2,276,502. Apportioning that gain, pursuant to § 12-218, the commissioner assessed a tax of $1594, which is the subject of this appeal.

The relevant facts are that Bard is engaged in the business of hospital and surgical specialties, such as rubber catheters, prostheses, and plastic products for surgical and patient nursing care. It is not engaged in the lumber, pulp, paper, or any other business remotely similar to those of International.

Neither International nor any of its affiliates have engaged in any intercorporate transactions with Bard. International and Bard have no common directors, officers or employees and do not participate in any common programs, services or functions. International has never exercised any oversight, supervision or control over the business operations of Bard. It has held its stock strictly for investment and not for operational purposes.

In 1971, International issued certain debentures in the aggregate principal amount of $533 million. These debentures were exchangeable for shares of Bard stock at a specific exchange rate. The debentures were not secured by the Bard stock; debenture holders simply had the right to convert debentures into Bard stock if they found the performance of that stock made it

worthwhile. International remained obligated on the debentures and showed the Bard stock in its annual reports as an investment. There is no evidence that any debenture holders ever exercised their right to exchange debentures for Bard stock.

Clearly, Bard and International were discreet businesses. International's limited use of the Bard stock to help it raise capital did not render Bard a part of International's unitary business. There is not here the loaning of funds and guaranteeing of loans between parent and subsidiary that the United States Supreme Court alluded to in *Container Corporation of America* v. *Franchise Tax Board,* supra, and in *Allied-Signal, Inc.* v. *Director, Division of Taxation,* supra.

The court concludes that the gain International realized from the sale of the Bard stock was not properly apportionable as a part of International's corporate income, pursuant to § 12-218, and, therefore, it was not properly subject to the Connecticut corporation business tax.

The plaintiff's appeal is overruled as to the commissioner's assessment of $353,703 attributed to the Canadian stock transaction, and sustained as to the commissioner's assessment of $1594 attributable to the Bard stock transaction.