**LOUIS DREYFUS CORPORATION,**
**Plaintiff/Appellee,**

v.

**Joe B. HUDDLESTON, Commissioner**
**of Revenue, State of Tennessee,**
**Defendant/Appellant.**

Court of Appeals of Tennessee,
Middle Section at Nashville.

May 31, 1996.

Application for Permission to Appeal
Denied by Supreme Court
Oct. 7, 1996.

---

**463**

Charles W. Burson, Attorney General and Reporter, Michael E. Moore, Solicitor General, Michael W. Catalano, Associate Solicitor General, for defendant/appellant.

Charles A. Trost, L. Beth Evans, Waller, Lansden, Dortch & Davis, Nashville, for plaintiff/appellee.

## *OPINION*

KOCH, Judge.

This appeal involves the corporate excise tax liability of a nondomiciliary corporation that carries on part of its business in Tennessee. The Commissioner of Revenue assessed deficiencies against the corporation because it had not included in its business income the investment earnings from the bond trading activities of one of its divisions. The corporation disagreed with the assessment but paid the alleged deficiencies and filed suit in the Chancery Court for Davidson County. Following a bench trial, the trial court found that the income from the bond trading activities was business income but that the bond

trading activities were not part of the corporation's unitary business. Accordingly, the trial court ordered the commissioner to refund $124,475.58 in taxes and interest. The commissioner asserts on this appeal that the evidence does not support the trial court's conclusion that the earnings of the bond trading division were non-unitary with the earnings of the corporation's other divisions. We affirm the judgment.

## I.

The Louis Dreyfus Corporation is a dealer in agricultural commodities[1] doing business in interstate and foreign commerce. It is organized under the laws of the State of New York but is commercially domiciled in Wilton, Connecticut. The corporation is a wholly-owned subsidiary of Louis Dreyfus Holding Company which is, in turn, owned by S.A. Louis Dreyfus & Cie., a French company located in Paris owned by the Louis Dreyfus family.

In 1981 the Louis Dreyfus Corporation acquired all the shares of the Allenberg Cotton Company, a cotton merchant that had been doing business in Memphis since 1921. Allenberg became a wholly owned subsidiary of the Louis Dreyfus Corporation in 1986. While Allenberg retained its name and continued as a "stand alone operation" after the merger, it gained access to Louis Dreyfus Corporation's significant capital base, computer technology, and world-wide communications system. Allenberg now controls approximately fifteen percent of the cotton market in the United States.

In 1983 one of the Louis Dreyfus Corporation's executives suggested that the corporation could generate additional revenue by buying and selling United States Treasury Securities. Accordingly, in 1984, the Louis Dreyfus Corporation organized the Bond Trading Group in Stamford, Connecticut to trade in government securities for its own account. The Bond Trading Group has no customers and holds no inventory. Rather, it buys or sells government bonds of various maturities and then immediately enters into repurchase agreements with other bond dealers as well as offsetting futures contracts or options to hedge its position.

The Louis Dreyfus Corporation conducts its business through seven trading groups. Six of these groups buy and sell commodities,[2] while the seventh group is the Bond Trading Group. Each group is managed by a different executive. The managers of the six commodities groups report to superiors in the Louis Dreyfus Corporation, while the manager of the Bond Trading Group reports directly to Gerald Louis–Dreyfus, the president of S.A. Louis Dreyfus & Cie. The corporation also provides administrative and support services to its groups and divisions. It uses a centralized cash management system, and it provides certain centralized accounting, legal, and payroll services. It also provides health insurance, retirement benefits, and worker's compensation coverage to all its employees.

The corporation's six commodities groups work closely together. They are connected to a proprietary, worldwide telecommunications system, and they share internally designed accounting and trading software. They also share lines of credit and have interrelated credit limits. Thus, when one commodities group obtains credit, the amount of credit available to the other commodities groups may be reduced. The commodities groups also work together frequently on common business ventures.

The Bond Trading Group is physically separated from the six commodities groups and does not use the telecommunications, computer, and information services shared by the other groups. It maintains its own repurchase lines of credit with various bond dealers that are completely separate from the lines of credit available to the six commodities groups. The Bond Trading Group also maintains its own telecommunications and computer facilities. While it uses a broker

---

**1.** These commodities include grain, oil seeds, orange juice, cotton, meat and livestock, coffee, cocoa, sugar, and textiles.

**2.** The six groups include: (1) the Grain and Oil Seeds Group, (2) the Orange Juice Group, (3) the Coffee and Cocoa Group, (4) the Meat and Livestock Group, (5) the Cotton Group, and (6) the Textiles and Sugar Group.

affiliated with the Louis Dreyfus Corporation to buy and sell futures and options contracts on the futures exchange, the Bond Trading Group pays this broker standard commissions and has the prerogative to use other brokers.

During the 1987, 1988, and 1989 tax years, the Bond Trading Group's gross income was $26,560,542, $14,049,369, and $2,367,611 respectively. The Louis Dreyfus Corporation treated the earnings of its six commodities groups during these tax years as apportionable business earnings for the purposes of paying Tennessee's corporate excise taxes. However, it reported the Bond Trading Group's earnings as nonbusiness earnings that would be neither allocable nor taxable under Tennessee's corporate excise tax statutes. Following an audit of the corporation's returns, the Commissioner of Revenue determined that the Bond Trading Group's earnings were taxable and assessed an $80,504.02 deficiency and $42,767.76 in interest against the Louis Dreyfus Corporation.

The Louis Dreyfus Corporation paid the assessment under protest and filed suit in the Chancery Court for Davidson County seeking a refund of the additional excise taxes and interest assessed by the commissioner. It asserted that the earnings of the Bond Trading Group were not business earnings because its bond trading activities were not part of its regular trade or business as a commodities dealer. It also asserted that the Bond Trading Group was not part of its unitary commodities business and, therefore, that these earnings were unrelated to the business activities it conducted in Tennessee.

The trial court conducted a two-day bench trial and on October 3, 1994 filed a memorandum opinion concluding that the Bond Trading Group's earnings were business income for the purpose of Tennessee's corporate excise tax statutes. It also determined that the Bond Trading Group's earnings were not taxable by Tennessee because the activities of the Bond Trading Group and the activities of the Louis Dreyfus Corporation's six commod-

ities groups did not constitute a unitary business. Accordingly, the trial court directed the commissioner to refund the Louis Dreyfus Corporation $124,475.58 in taxes and interest. The commissioner has perfected this appeal.[3]

## II.

■ The State of Tennessee taxes corporate income through the Excise Tax Law [Tenn.Code Ann. §§ 67–4–801, –822 (1994 & Supp.1995)] and the Franchise Tax Law [Tenn.Code Ann. § 67–4–901, –921 (1994 & Supp.1995)]. States may tax the interstate income of nondomiciliary corporations but may not exercise unbridled discretion in their taxing decisions. State taxation of corporate income earned in interstate commerce must be consistent with the Commerce Clause and the Due Process Clause of the Fourteenth Amendment. *Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. 425, 436–37, 100 S.Ct. 1223, 1231, 63 L.Ed.2d 510 (1980); *American Tel. & Tel. Co. v. Huddleston,* 880 S.W.2d 682, 689 (Tenn.Ct.App.1994).

■ A state cannot, as a general rule, tax value earned beyond its borders. *Barclays Bank PLC. v. Franchise Tax Bd.,* 512 U.S. 298, ——, 114 S.Ct. 2268, 2272, 129 L.Ed.2d 244 (1994); *ASARCO, Inc. v. Idaho State Tax Comm'n,* 458 U.S. 307, 315, 102 S.Ct. 3103, 3108, 73 L.Ed.2d 787 (1982). However, a state tax applied to interstate commerce can survive Commerce Clause scrutiny (1) if the tax is applied to an activity with a substantial nexus to the state, (2) if the tax is fairly apportioned, (3) if the tax does not discriminate against interstate commerce, and (4) if the tax is fairly related to the services provided by the taxing state. *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326 (1977). It will also be consistent with the Due Process Clause of the Fourteenth Amendment (1) if there is a minimal connection between the interstate activities to be taxed and the taxing state [4] and (2) if there is

---

**3.** The Louis Dreyfus Corporation concedes that the record supports the trial court's conclusion that the Bond Trading Group's earnings are business earnings.

**4.** The "minimal connection" requirement of the due process analysis differs from the "substantial nexus" requirement of the Commerce Clause analysis. The Commerce Clause reflects broader

a rational relationship between the income attributed to the taxing state and the intrastate value of the business. *Allied–Signal, Inc. v. Director, Div. of Taxation,* 504 U.S. 768, 772, 112 S.Ct. 2251, 2255, 119 L.Ed.2d 533 (1992); *Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. at 436–37, 100 S.Ct. at 1231.

■ The states have wide latitude to devise methods to attribute business earnings to a taxing state. *Moorman Mfg. Co. v. Blair,* 437 U.S. 267, 279, 98 S.Ct. 2340, 2347–48, 57 L.Ed.2d 197 (1978); *American Tel. & Tel. Co. v. Huddleston,* 880 S.W.2d at 689. The three methods most commonly used to allocate corporate earnings for the purposes of taxation include (1) separate accounting, (2) allocation, and (3) apportionment. *Holiday Inns, Inc. v. Olsen,* 692 S.W.2d 850, 852 (Tenn.1985). Each of these methods involve some degree of arbitrariness; *Barclays Bank PLC. v. Franchise Tax Bd.,* 512 U.S. at ——, 114 S.Ct. at 2272; *Container Corp. of America v. Franchise Tax Bd.,* 463 U.S. 159, 182, 103 S.Ct. 2933, 2949, 77 L.Ed.2d 545 (1983); however, apportionment does a better job of accounting for the many subtle and largely unquantifiable transfers of value that take place among the components of a single enterprise. *Allied–Signal, Inc. v. Director, Div. of Taxation,* 504 U.S. at 783, 112 S.Ct. at 2261.

■ Tennessee, like twenty-four other states, has chosen to tax business income using the apportionment method embodied in the Uniform Division of Income for Tax Purposes Act ("UDITPA"). *American Tel. & Tel. Co. v. Huddleston,* 880 S.W.2d at 685 (Tennessee's corporate excise tax statutes are based on UDITPA). Under the apportionment method, all of a multistate corporation's business income is determined and then apportioned pro rata among the states in which the corporation does business. Each state is permitted to tax that portion of the corporation's income that is proportional to the portion of its business done in the state. *Holiday Inns, Inc. v. Olsen,* 692 S.W.2d at 852; 1 Jerome R. Hellerstein &

Walter Hellerstein, *State Taxation* ¶ 8.5 (2d ed. 1993) ("Hellerstein").

■ The unitary business principle is at the heart of any formula to apportion corporate revenues for tax purposes. *Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. at 439, 100 S.Ct. at 1232; *Peterson Mfg. Co. v. State,* 779 S.W.2d 784, 786 (Tenn.1989). It is judicially created, *American Tel. & Tel. Co. v. Huddleston,* 880 S.W.2d at 690, and is intended to balance two federal constitutional imperatives—first that the states have broad authority to devise methods for taxing a corporation's intrastate value or income, and second that the states cannot tax value or income that cannot, in all fairness, be attributed to the corporation's activities within the state. *Allied–Signal, Inc. v. Director, Div. of Taxation,* 504 U.S. at 780, 112 S.Ct. at 2259.

■ The central purpose of the unitary business principle is to ensure that each state taxes only its fair share of a corporation's interstate transactions. *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.,* —— U.S. ——, ——, 115 S.Ct. 1331, 1338, 131 L.Ed.2d 261 (1995); *Goldberg v. Sweet,* 488 U.S. 252, 260–61, 109 S.Ct. 582, 588, 102 L.Ed.2d 607 (1989). The principle operates on the premise that the value of a unitary business is apportionable to a state for taxation if the business's operations within the state contribute to or benefit from the corporation's unitary business. States may not include in a business's apportionable tax base income not derived directly from the unitary business. Thus, the pivotal question in cases such as this one is whether the business income sought to be included in the apportionable tax base derives from an unrelated business activity constituting a discrete business enterprise that is not part of the taxpayer's unitary business. *Allied–Signal, Inc. v. Director, Div. of Taxation,* 504 U.S. at 780, 112 S.Ct. at 2259; *Exxon Corp. v. Wisconsin Dep't of Revenue,* 447 U.S. 207, 224, 100 S.Ct. 2109, 2120, 65 L.Ed.2d 66 (1980).

concerns regarding the effects of state regulation on the national economy, and the purpose of the requirement is to lighten burdens on interstate commerce. *Quill Corp. v. North Dakota,* 504 U.S. 298, 313, 112 S.Ct. 1904, 1913, 119 L.Ed.2d 91 (1992).

## III.

A unitary business is a business whose components are too closely connected and necessary to each other to justify division or separate consideration as independent units. *See* 4 Zolman Cavitch, *Business Organizations* § 79.03[3][a] (1996). It is operated as a whole, and its components are substantially interdependent. *Container Corp. of America v. Franchise Tax Bd.,* 463 U.S. at 179, 103 S.Ct. at 2947; *F.W. Woolworth Co. v. Taxation and Revenue Dep't,* 458 U.S. 354, 371, 102 S.Ct. 3128, 3139, 73 L.Ed.2d 819 (1982).

The underlying unity or diversity of a business does not necessarily depend on the form or structure of its organization, *Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. at 440, 100 S.Ct. at 1233, or on the business's "purpose," *ASARCO, Inc. v. Idaho State Tax Comm'n,* 458 U.S. at 326, 102 S.Ct. at 3114. Accordingly, a single corporation may carry on two or more discrete businesses without these businesses being considered unitary. *See* Hellerstein § 8.11[6]; Tenn.Code Ann. § 67–4–804(a)(1) (Supp. 1995); Tenn.R. & Regs. r. 1320–6–1–.23(1)(d) (1993); Multistate Tax Comm'n Allocation and Apportionment Regulations reg. IV.1.(b) (Multistate Tax Comm'n 1990), *reprinted in* 1 State Tax Guide (CCH) ¶ 352a (1995).

Components that operate as discrete business entities are not part of a unitary business even if the business could operate them as integrated divisions. *Allied–Signal, Inc. v. Director, Div. of Taxation,* 504 U.S. at 781, 112 S.Ct. at 2260. *F.W. Woolworth Co. v. Taxation and Revenue Dep't,* 458 U.S. at 362, 102 S.Ct. at 3134. Thus, the proper inquiry focuses on the underlying unity or diversity of the business, *Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. at 440, 100 S.Ct. at 1233, and on the relationship between the activities of the component in the taxing state and the activities occurring elsewhere, not just on the common relationships between the various components and the central structure of the business. *Commonwealth v. ACF Indus., Inc.,* 441 Pa. 129, 271 A.2d 273, 280 (1970).

Likewise, the unity or diversity of a business does not depend on whether the earnings of its components ultimately add value to the entire business. *F.W. Woolworth Co. v. Taxation and Revenue Dep't,* 458 U.S. at 363, 102 S.Ct. at 3135. A business is unitary when the operation of one of its components depends upon and contributes to the operation of its other components. *Barclays Bank PLC. v. Franchise Tax Bd.,* 512 U.S. at —— n. 1, 114 S.Ct. at 2272 n. 1; *Tenneco West, Inc. v. Franchise Tax Bd.,* 234 Cal.App.3d 1510, 286 Cal.Rptr. 354, 361 (1991); *Champion Int'l Corp. v. Bureau of Revenue,* 88 N.M. 411, 540 P.2d 1300, 1302 (Ct.App.1975). Conversely, it is not unitary when the income producing activities of one of its components are not operationally linked to the income producing activities of its other components. *Allied–Signal, Inc. v. Director, Div. of Taxation,* 504 U.S. at 786–87, 112 S.Ct. at 2262–63; *Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. at 439, 100 S.Ct. at 1232.

## IV.

Tax assessments are presumed to be valid. *Stratton v. Jackson,* 707 S.W.2d 865, 867 (Tenn.1986); *Ace of Clubs v. Huddleston,* 872 S.W.2d 679, 681 (Tenn.Ct.App.1993). Accordingly, a taxpayer who challenges a franchise tax assessment must show by clear and convincing evidence that the commissioner's application of the apportionment formula has caused extraterritorial value to be taxed. *Container Corp. of America v. Franchise Tax Bd.,* 463 U.S. at 164, 103 S.Ct. at 2939–40; *W.S. Dickey Clay Mfg. Co. v. Dickinson,* 200 Tenn. 25, 35, 289 S.W.2d 533, 537 (1956); *American Tel. & Tel. Co. v. Huddleston,* 880 S.W.2d at 690.

This heightened burden of proof defies precise definition, *see Majors v. Smith,* 776 S.W.2d 538, 540 (Tenn.Ct.App.1989),[5] but it is intended to instruct the fact-finder concerning the degree of confidence it should have in the correctness of its decision. *See O'Daniel v. Messier,* 905 S.W.2d 182, 187

---

5. The "clear and cogent" standard is essentially similar to the "clear and convincing" standard.

*See Pierce v. Flynn,* 656 S.W.2d 42, 46 (Tenn.Ct. App.1983).

(Tenn.Ct.App.1995). Clear and cogent evidence is more than a preponderance of the evidence, *see Gray v. Todd*, 819 S.W.2d 104, 108 (Tenn.Ct.App.1991). It need not, however, be uncontradicted, *see Alexander v. C.C. Powell Realty Co.*, 535 S.W.2d 154, 158 (Tenn.Ct.App.1975), and it need not remove all reasonable doubt. *See In re Estate of Wardell*, 674 S.W.2d 293, 295 (Tenn.Ct.App. 1983). In the context of this case, the clear and cogent evidence must be sufficient to overcome the opposing evidence and the presumed validity of the assessment and must produce in the fact-finder's mind a firm belief that its decision is correct.

■ The legal principles reviewed in the preceding sections provide the conceptual framework for determining whether a particular commercial enterprise is a unitary business for taxation purposes. Applying the unitary business principle is, however, a fact-sensitive process requiring a careful analysis of the operation of the business enterprise. *Allied–Signal, Inc. v. Director, Div. of Taxation*, 504 U.S. at 785, 112 S.Ct. at 2262; *ASARCO, Inc. v. Idaho State Tax Comm'n*, 458 U.S. at 329 n. 24, 102 S.Ct. at 3116 n. 24; *International Paper Co. v. Commissioner of Revenue Servs.*, 42 Conn.Supp. 356, 621 A.2d 330, 332 (1992). Because of the endless variety of business enterprises, the precedents from other jurisdictions, or even from this jurisdiction, provide only limited assistance in this factual inquiry.

We review the trial court's findings of fact in these cases in accordance with Tenn. R.App.P. 13(d), and thus we will presume that the trial court's findings of fact are correct unless the evidence preponderates to the contrary. *Peterson Mfg. Co. v. State*, 779 S.W.2d at 787. Based on the facts found by the trial court, we must also determine whether the Louis Dreyfus Corporation has come forward with clear and cogent evidence that the Bond Trading Group was not part of its unitary business and that the income earned by the Bond Trading Group was unrelated to the sale of cotton in Tennessee by Allenberg.

The courts have devised several tests for determining whether a business is unitary. The earliest of these, the so-called "three unities" test required the courts to examine the unity of ownership, the unity of operation as evidenced by central purchasing, advertising, accounting, and management, and the unity of a centralized executive force and general system of operation. *Butler Bros. v. McColgan*, 315 U.S. 501, 508, 62 S.Ct. 701, 704–05, 86 L.Ed. 991 (1942); *Peterson Mfg. Co. v. State*, 779 S.W.2d at 786; *W.S. Dickey Clay Mfg. Co. v. Dickinson*, 200 Tenn. at 34–35, 289 S.W.2d at 537. The second test employed by the United States Supreme Court requires the courts to examine the record for evidence of functional integration, centralization of management, and economies of scale. *F.W. Woolworth Co. v. Taxation and Revenue Dep't*, 458 U.S. at 364, 102 S.Ct. at 3135; *Mobil Oil Corp. v. Commissioner of Taxes*, 445 U.S. at 438, 100 S.Ct. at 1232. Other courts have used the "dependency and contribution" test to determine whether the business components under consideration contribute to each other and the operation of the business as a whole. *A.M. Castle & Co. v. Franchise Tax Bd.*, 36 Cal.App.4th 1794, 43 Cal.Rptr.2d 340, 346 (1995); *Ramsay, Scarlett & Co. v. Comptroller*, 302 Md. 825, 490 A.2d 1296, 1302 (1985); *Silent Hoist & Crane Co. v. Director, Div. of Taxation*, 100 N.J. 1, 494 A.2d 775, 784 (1985). These tests are not mutually exclusive but rather are alternative ways to determine whether the components of the business operate under "an umbrella of central management and controlled interaction," *Exxon Corp. v. Wisconsin Dep't of Revenue*, 447 U.S. at 224, 100 S.Ct. at 2120.

■ No single factor is controlling under any of the tests. Instead, the courts examine these factors in combination to determine whether the business is unitary. Since states may only tax value having substantial connection with the state, the courts must consider not only the relationship between the non-resident business and the non-resident component whose income is sought to be taxed but also the relationship between the in-state component and the non-resident component. *See Central National–Gottesman, Inc. v. Director, Div. of Taxation*, 14 N.J. Tax 545, 556–57 (Tax.Ct.1995); *In re Income Tax Protest of Griffin Television*,

*Inc. (Griffin Television, Inc. v. State ex rel. Oklahoma Tax Comm'n),* 877 P.2d 588, 593 (Okla.1994).

■ The evidence in this record demonstrates significant connections between the Louis Dreyfus Corporation and the Bond Trading Group. It does not, however, demonstrate significant connections or a significant flow of value between the Bond Trading Group and Allenberg. Since Allenberg is the Louis Dreyfus Corporation's only connection with Tennessee, there is no evidence of a substantial connection between Tennessee and the income earned by the Bond Trading Group. There is likewise clear and cogent evidence supporting the trial court's conclusion that the activities of the Bond Trading Group were not part of the Louis Dreyfus Corporation's unitary business.

### A.

#### OWNERSHIP AND CONTROL

■ There is no factual dispute concerning unity of ownership in this case. The Louis Dreyfus Corporation owns both the Bond Trading Group and Allenberg. However, a business's choice of structure does not control whether the business is unitary. *Allied–Signal, Inc. v. Director, Div. of Taxation,* 504 U.S. at 784, 112 S.Ct. at 2261; *Central National–Gottesman, Inc. v. Director, Div. of Taxation,* 14 N.J. Tax at 558. If it did, unity of ownership would trump all other considerations when the taxpayer is a single corporation. Unity of ownership alone does not necessarily indicate that the various components of a business are substantially interdependent on each other.

A more significant inquiry concerns the control of the business' activities. This inquiry should consider not only the extent of centralized control of the business but also the existence and extent of control that the business' components have over the activities of the other components. While there are some managerial links between the Louis Dreyfus Corporation and the Bond Trading Group, there are no managerial links between the Bond Trading Group and Allenberg.

James Wayne is the executive officer of the Bond Trading Group and is also a vice president of the Louis Dreyfus Corporation. Unlike the managers of the other commodities groups, Mr. Wayne reports directly to Gerard Louis–Dreyfus and occasionally to Ernst Steiner, Mr. Louis–Dreyfus' principal assistant. Neither Mr. Louis–Dreyfus nor Mr. Steiner play a significant role in the day-to-day operations of the Bond Trading Group. They do not advise Mr. Wayne or his staff concerning investment strategies or specific trading decisions. Accordingly, the Bond Trading Group has complete autonomy to determine its own policies with regard to its primary business activities. The Louis Dreyfus Corporation exercises only occasional management oversight over the Bond Trading Group, and this oversight is extremely general when it is exercised.

Likewise, the record contains no evidence of the existence of any managerial links between the Bond Trading Group and Allenberg. Thomas Malone, Jr., Allenberg's executive vice president, testified that he had met Mr. Wayne only once and that his reporting relationship to the Louis Dreyfus Corporation differed from Mr. Wayne's. Neither Mr. Wayne nor Mr. Malone has any significant knowledge concerning each other's activities or business strategies.

### B.

#### FUNCTIONAL INTEGRATION

■ Functional integration among a business's components is another earmark of a unitary business. In order for a business to be unitary, there must be a substantial interrelationship or interdependence among its basic operations. *See State ex rel. Arizona Dep't of Revenue v. Talley Indus., Inc.,* 182 Ariz. 17, 893 P.2d 17, 24 (Ct.App.1994). While there is substantial interdependence among the Louis Dreyfus Corporation's six commodities groups, the record contains clear and cogent evidence that the Bond Trading Group does not have a similar relationship either with the Louis Dreyfus Corporation or with Allenberg.

The Bond Trading Group has no operational relationships with the Louis Dreyfus Cor-

poration's six commodities groups. Its business activities are discrete from the other groups. In addition, its offices are geographically separated from the other corporate offices; it uses separate telecommunications and computer systems; and it maintains separate financial relationships that are not available to the other groups. It does not share employees with the other groups or participate in common training programs, and its employees do not rotate to and from the commodities groups. The Bond Trading Group could easily exist and operate without the commodities groups. It neither depends on nor contributes to the business operations of the commodities groups, especially Allenberg.

■ The strongest operational link between the Bond Trading Group and Allenberg results from the Louis Dreyfus Corporation's cash management policy. At the end of every day, the corporation "sweeps" the excess funds in all its groups' accounts into a corporate central account. When a group requires funds, the corporation transfers money from its central account into the group's account. Since the funds are commingled and theoretically available to all the groups, the commissioner insists that the cash management policy is strong evidence that the Louis Dreyfus Corporation's business is unitary. We do not agree.

The United States Supreme Court has recognized that one component may "add to the riches" of the corporation and yet remain a discrete business enterprise. *ASARCO, Inc. v. Idaho State Tax Comm'n*, 458 U.S. at 328, 102 S.Ct. at 3115. Accordingly, the Tax Court of New Jersey has determined on at least two occasions that a division managing a corporation's investments was not unitary with the corporation's other operating divisions. *Central National–Gottesman, Inc. v. Director, Div. of Taxation*, 14 N.J. Tax at 559–60; *American Home Prods. Corp. v. Taxation Div. Director*, 11 N.J. Tax 287, 307 (Tax Ct.1990).

The director made the same argument in the *Central National–Gottesman, Inc.* case that the commissioner is making in this case. He insisted that the commingling of funds was evidence that the corporation's non-resi-

dent investment division was unitary with another division located in New Jersey. After noting that it was not unusual for a corporation to have a division devoted to managing its investments that is unrelated to the corporation's operational divisions, the tax court determined that the commingling of interest and dividend income with the other divisions' operating income was not necessarily indicative of a unitary business when the investment income was sufficient to provide the funds needed to operate the investment division. *Central National–Gottesman, Inc. v. Director, Div. of Taxation*, 14 N.J. Tax at 556 (citing *American Home Prods. Corp. v. Taxation Div. Director*, 11 N.J. Tax at 307).

We take the same view of the commingling of the Bond Trading Division's revenues with those generated by Allenberg. The Bond Trading Division's investment activities are self-funded and self-contained. When the division purchases a bond, it immediately enters into an offsetting futures contract or option to hedge its position. Little cash is required because these transactions are essentially simultaneous purchases and sales. When credit is required, the Bond Trading Group relies on its own repurchase lines of credit that are not available to the commodities divisions, and these borrowings are fully secured by the bonds being purchased.

Allenberg has not invested any of its working capital with the Bond Trading Group, nor has the Bond Trading Group invested any of its working capital with Allenberg. Accordingly, the Bond Trading Group's transactions were passive investments and were not apportionable to Tennessee since they were operationally unrelated to any of Allenberg's activities in Tennessee. *See Allied–Signal, Inc. v. Director, Div. of Taxation*, 504 U.S. at 787, 112 S.Ct. at 2263; *ASARCO, Inc. v. Idaho State Tax Comm'n*, 458 U.S. at 327, 102 S.Ct. at 3114; *Exxon Corp. v. Wisconsin Dep't of Revenue*, 447 U.S. at 223, 100 S.Ct. at 2120.

### C.

#### ECONOMIES OF SCALE

■ We finally turn to the evidence with regard to the economies of scale or the unity

operation. There is no question that the Louis Dreyfus Corporation provides certain central staff functions and common operational resources to all its trading groups, including the Bond Trading Group and Allenberg. However, the provision of these central services does not undermine the Bond Trading Group's operational independence from the Louis Dreyfus Corporation and certainly from Allenberg.

The Louis Dreyfus Corporation pays the salaries of employees of all its trading groups and also provides a company-wide pension plan, an employee benefits package, and workmen's compensation coverage. It also provides payroll services, and pays for the lease of the premises occupied by the Bond Trading Group as well as the other groups. The corporation also makes legal services available to the trading groups as well as centralized accounting services, primarily for the preparation of the annual consolidated corporate reports.

The Bond Trading Group does not necessarily use the same central services used by the commodities divisions. It employs its own accountant who performs the more complex accounting activities relating to the day-to-day activities of the division. It also has chosen to obtain its own legal assistance, and it does not use any of the common credit resources shared by the commodities groups.

The Bond Trading Group also buys and sells bond futures and options contracts through Term Commodities, Inc.,[6] the same securities broker that provides futures trading and clearing facilities to the commodities groups. The Bond Trading Group must use a broker for these transactions, but it is not required to use Term Commodities, Inc. The Bond Trading Group does not depend on this broker's expertise in its investment decisions and could easily use another broker to provide the needed clearing services. The Bond Trading Group's dealings with Term Commodities, Inc. are at arms length, and it pays Term Commodities, Inc. a standard commission for its services.

6. Term Commodities, Inc. is a separate corporate affiliate of the Louis Dreyfus Corporation. The commissioner is not asserting, however, that

The record contains no evidence of any interdependence between the Bond Trading Group and Allenberg. The Bond Trading Group has benefitted to some extent from its affiliation with the Louis Dreyfus Corporation, but these benefits, considered in light of the other factors, are not significant enough to require the courts to find that the activities of the Bond Trading Group were unitary with those of the corporation's six commodities divisions.

## V.

We find that the record contains clear and cogent evidence supporting the trial court's conclusion that the activities of the Bond Trading Group were not unitary with those of the Louis Dreyfus Corporation and the Allenberg Cotton Company. Accordingly, we affirm the judgment and remand the case for whatever other proceedings may be required. We also tax the costs of this appeal to the Commissioner of Revenue.

TODD, P.J., (M.S.), and CANTRELL, J., concur.

its business is unitary with either the commodities groups or the Bond Trading Group.