L. M. BERRY & COMPANY,　　　　　　)

# FILED

**October 28, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

　　　　　　　　　　　　　　　)
　　Plaintiff/Appellant,　　　　　)
　　　　　　　　　　　　　　　)　　Appeal No.
v.　　　　　　　　　　　　　　)　　01A01-9809-CH-00487
　　　　　　　　　　　　　　　)
JOE B. HUDDLESTON, in his official　　)　　Davidson Chancery
capacity as COMMISSIONER OF　　)　　No. 94-3189-I
REVENUE, STATE OF TENNESSEE,　　)
　　　　　　　　　　　　　　　)
　　Defendant/Appellee.　　　　　)

COURT OF APPEALS OF TENNESSEE

APPEAL FROM THE CHANCERY COURT FOR DAVIDSON COUNTY

AT NASHVILLE, TENNESSEE

THE HONORABLE IRVIN H. KILCREASE, JR., CHANCELLOR

RICHARD W. BELL　　　　　　　　JONATHAN COLE
General Attorney　　　　　　　　Baker, Donelson, Bearman & Caldwell
BellSouth Corporation　　　　　　511 Union Street, Suite 1700
1155 Peachtree Street, N.E., Suite 1800　　1700 Nashville City Center
Atlanta, Georgia 30309　　　　　　Nashville, Tennessee 37219

GREGORY G. FLETCHER
Baker, Donelson, Bearman & Caldwell
2000 First Tennessee Building
165 Madison Avenue
Memphis, Tennessee 38103
　　ATTORNEYS FOR PLAINTIFF/APPELLANT

PAUL G. SUMMERS
Attorney General and Reporter

JIMMY G. CREECY
Office of the Attorney General
425 Fifth Avenue North
Nashville, Tennessee 37243
     ATTORNEYS FOR DEFENDANT/APPELLEE


REVERSED AND REMANDED

WILLIAM B. CAIN, JUDGE

# O P I N I O N

This case concerns a suit for refund, under Tennessee Code Annotated section 67-1-1803, of excise taxes assessed as a result of an audit conducted by the Tennessee Department of Revenue's field audit division and covering tax years 1989-1991. The taxpayer, L. M. Berry and Company (LMB) sought the refund of $96,605.00 in excise tax, assessed on dividends declared by ITT World Directories, Inc. (ITTWD) and Promedia, S.A.(Promedia) and paid to LMB. LMB paid the assessed tax and brought suit for refund alleging that under Tennessee's version of the Uniform Distribution of Income for Tax Purposes Act, *see* Tenn. Code Ann. 67-4-801 *et seq.*; the dividends were not taxable as business earnings under section 67-4-804. In addition LMB argued that the inclusion of these dividends in LMB's income for excise tax purposes was inconsistent with the United States Constitution's Commerce clause and its Fourteenth Amendment Due Process provisions. On cross-motions for summary judgment, the chancellor dismissed LMB's complaint, holding as follows:

> The court finds that the dividends received by the plaintiff from its affiliates ITTWD and Promedia during the audit period at issue are "business earnings" within the meaning of T.C.A. §67-4-804, and are subject to apportionment to Tennessee for purposes of the Tennessee Excise Tax, T.C.A. §67-4-801 *et seq.* The Court further finds that the Commissioner's application of the statutory apportionment formula to these earnings has not caused extraterritorial value to be taxed, and that the assessment is thus in accordance with the Due Process Clause and Commerce Clause of the United States Constitution.

From the grant of summary judgment below, LMB appeals.

# I. TENNESSEE FRANCHISE AND EXCISE TAX AND "UNITARY BUSINESS THEORY"

Since this case concerns both Tennessee's statutory definition of "business earnings" as well as the constitutional application of unitary business theory, any discussion of the facts necessitates an explanation of how this tax law developed. The Court approves the concise summary of Tennessee's franchise and excise tax system in the brief on behalf of the commissioner. Appellee writes:

> The tax at issue in this case, the excise tax, has been the major tax imposed on corporations by the State of Tennessee for over 75 years. Originally enacted in 1923, the excise tax, T.C.A. §§ 67-4-801, *et seq.*, was most recently redrafted and adopted in 1976. The excise tax is upon the privilege of engaging in business in Tennessee in corporate form, *First American Nat'l Bank v. Olsen*, 751 S.W.2d 417 (1987), *appeal dismissed*, 485 U.S. 1001, 108 S.Ct. 1460, 99 L.Ed. 2d 691 (1988); *Tennessee Growers, Inc. v. King*, 682 S.W.2d 203 (Tenn. 1984) and is imposed at the rate of 6% "of the net earnings for the next preceding fiscal year for business done in this state." T.C.A. § 67-4-806(a). The other major tax on corporations, the franchise tax, is also a privilege tax "upon the privilege of doing business in corporate form in this state," T.C.A. § 67-4-903(a), and imposed at the rate of $.25 per $100 of issued and outstanding stock, surplus and undivided profits. T.C.A. § 67-4-904(a).
>
> In the event that a corporation engages in business in Tennessee as well as other states, it is entitled to apportion its income and property for purposes of determining its tax liability. T.C.A. §§ 67-4-809 (excise tax) and 67-4-909 (franchise tax). Both taxes are considered in tandem and construed together as one scheme of taxation. *American Bemberg Corp. v. Carson,* 188 Tenn. 263, 272, 219 S.W.2d 169, 173 (1949); *First American Nat'l Bank v. Olsen*, 751 S.W.2d at 421. A state does possess inherent power to tax a non-domiciliary corporation's activities to compensate that State for the "protection, opportunities and benefits" the State confers on the corporation's activities within the State. *Allied-Signal, Inc. v. Director*, 504 U.S. 768, 112 S.Ct. 2251, 2258, 119 L.Ed.2d 133 (1992).

The *Allied-Signal* case, cited above, is considered one of the pantheon of cases charting the interplay between a state's ability to tax interstate entities doing business in the state on one hand, and the provisions of the Commerce Clause and the Due Process Clause of the United States Constitution on the other. *See* Art. I, §8, U.S. Const.; U.S. Const. amend. XIV. *See also ASARCO, Inc. v. Idaho State Tax Comm'n,* 458 U.S. 307, 102 S.Ct. 3103, 73 L.Ed. 2d 787 (1982); *Container Corp. of America v. Franchise Tax Bd.,* 463 U.S. 159, 103 S.Ct. 2933, 7 L.Ed.2d 545 (1983).

*Allied-Signal* concerned New Jersey's attempt to tax Allied-Signal Corp., a Delaware

corporation doing business in all fifty states, for income received from the sale of stock in a New Jersey corporation principally located in New York. Justice Kennedy, writing for the majority, provided the following discussion of the unitary business principle:

> Because of the complications and uncertainties in allocating the income of multistate businesses to the several States, we permit States to tax a corporation on an apportionable share of the multistate business carried on in part in the taxing state. That is the unitary business principle. It is not a novel construct, but one that we approved within a short time after the passage of the Fourteenth Amendment's Due Process Clause. We now give a brief summary of its development.
>
> When States attempted to value railroad or telegraph companies for property tax purposes, they encountered the difficulty that what makes such a business valuable is the enterprise as a whole, rather than the track or wires that happen to be located within a State's borders. The Court held that consistent with the Due Process Clause, a State could base its tax assessments upon "the proportionate part of the value resulting from the combination of the means by which the business was carried on, a value existing to an appreciable extent throughout the entire domain of operation." *Adams Express Co. v. Ohio State Auditor*, 165 U.S. 194, 220-221, 17 S.Ct. 305, 309, 41 L.Ed. 683 (1987) (citing *Western Union Telegraph Co. v. Attorney General of Massachusetts*, 125 U.S. 530, 8 S.Ct. 961, 31 L.Ed. 790 (1888))...
>
> *Adams Express* recognized that the principles that permit a State to levy a tax on the capital stock of a railroad, telegraph, or sleeping car company by reference to its unitary business also allow proportional valuation of a unitary business in enterprises of other sorts. As the Court explained: "The physical unity existing in the former is lacking in the latter; but there is the same unity in the use of the entire property for the specific purpose, and there are the same elements of value arising from such use." 165 U.S., at 221, 17 S.Ct., at 309.
>
> The unitary business principle was later permitted for state taxation of corporate income as well as property and capital. Thus, in *Underwood Typewriter Co. v. Chamberlain*, 254 U.S. 113, 120-121, 41 S.Ct. 45, 47, 65 L.Ed. 165 (1920), we explained:
>
>> "The profits of the corporation were largely earned by a series of transactions beginning with manufacture in Connecticut and ending with the sale in other States. In this it was typical of a large part of the manufacturing business conducted in the State. The legislature in attempting to put upon this business its fair share of the burden of taxation was faced with impossibility of allocating specifically the profits earned by the processes conducted within its borders. It, therefore, adopted a method of apportionment which, for all that appears in this record, reached, and was

> meant to reach, only the profits earned within the State."

> As these cases make clear, the unitary business rule is a recognition of two imperatives: the States' wide authority to devise formulae for an accurate assessment of a corporation's intrastate value or income; and the necessary limit on the State's authority to tax value or income that cannot in fairness be attributed to the taxpayer's activities within the State.

*Allied-Signal, Inc. v. Director, Div. Of Taxation*, 504 U.S.768, 778-80, 112 S.Ct. 2251, 2258-2259, 119 L.Ed.2d 533, (1992).

As is true of the case at bar, the Supreme Court stated in *Allied Signal*, "[i]t is this second component, the necessity for a limiting principle, that underlies this case." *Allied-Signal,* 504 U.S., at 780, 112 S.Ct., at 2259.

Regarding a working statutory and regulatory definition of "business earnings," our state statutes and rules provide the following:

> "Business earnings" means earnings arising from transactions and activity in the regular course of the taxpayer's trade or business or earnings from tangible and intangible property if the acquisition, use, management or disposition of the property constitutes an integral part of the taxpayer's regular trade or business operations. In essence, earnings which arise from the conduct of the trade or trades or business operations of a taxpayer are "business earnings," and the taxpayer must show by clear and cogent evidence that particular earnings are classifiable as nonbusiness earnings. . . .

Tenn. Code Ann. §67-4-804(a)(1)
-and-

> Dividends are business earnings where the stock with respect to which the dividends are received arises out of or was acquired in the regular course of the taxpayer's trade or business operations or where the purpose for acquiring and holding the stock is related to or incidental to such trade or business operations.

Tenn. Comp. R. & Regs. R. 1320-6-1-.23(d)(1991). The assessment in question was made by the commissioner allegedly pursuant to this statutory and regulatory authority. Since this case comes to us on appeal from the grant of summary judgment on cross-motions, and since the litigants before us dispute only the legal effect of undisputed facts, the review of the trial court's action is *de novo* upon the record with no presumption of correctness on appeal. *See Cowden v. Sovran Bank/Central* South, 816 S.W.2d 741, 744 (Tenn. 1991); *Gehl Corp. v. Johnson*, 991 S.W.2d 246, 248 (Tenn. Ct.

App. 1998); *see also Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993). Thus the issue framed by the " unitary business theory" and Tennessee's definition of business income is whether the undisputed facts below establish that LMB, ITTWD and Promedia either operate as a unit, or are at least related enough, so that dividends received as a result of LMB's stock holdings in the latter two corporations can be taxed as income "related or incidental to" LMB's yellow pages solicitation in Tennessee. With the issues thus established, the Court now must analyze the undisputed facts with regard to the nature and operation of the three business entities to determine their relationship. At the end of this analysis in this *de novo* review, the proper test for determining integration and interrelation will be ascertained and applied to the facts to evaluate the legal correctness of the chancellor's action. *See* Tenn. R. App. P. 13(a).

## II. THE NATURE OF LMB'S BUSINESS

LMB, a Georgia corporation with its principal place of business in Ohio, sells "Yellow Pages" advertising to commercial customers in several states including Tennessee. In most transactions, LMB acts as a sales agent between local telephone companies and commercial telephone subscribers within those companies' service areas. LMB receives commissions from the telephone companies on the eventual advertising contracts. On certain advertising contracts requiring publishing of "Yellow Pages" , LMB generally out sources the publishing portion of its agreement, charging a higher commission to the telephone company to cover the cost. The advertising contracts between telephone company and commercial customers are renewed annually, whereas the commission contract between LMB and the telephone company have a five- to seven-year term. Occasionally, LMB will sell advertising space to a customer outside a telephone company's service area and bill that customer directly. Through a subsidiary, LMB also furnishes "national" yellow pages services, under which an advertiser may deal with a single sales agent (LMB) in placing advertisements in yellow pages nationally.

## III. THE NATURE AND FORMATION OF ITTWD AND PROMEDIA

In 1966, LMB, then a Maryland corporation headquartered in Ohio, and International Telephone and Telegraph Corporation (ITT), a Delaware corporation, formed another Delaware corporation ITT World Directories, Inc. (ITTWD) for the purpose of developing a telephone directory business in foreign markets. As evidenced by the undisputed portions of LMB's "Statement of Material Facts in support of Plaintiff's Motion for Summary Judgment:"

13. ITTWD, which maintains its principal offices in Brussels, Belgium, created a number of international subsidiaries or "units," to sell telephone directory advertising similar to the "yellow pages." Each of these "units" was a foreign corporation or association. Generally, these "units" operated within, and were confined to, specific countries, since most foreign telephone companies were owned by foreign governments. All such "units" operated solely overseas.

14. ITT and LMB, acting outside of ITTWD, also created a number of "units" through a wholly-owned subsidiary of ITT, International Standard Electric Corp., a Delaware corporation. One of these was Promedia, S.A., a Belgium corporation. ...

* * *

17. During the audit period (January 1, 1989 through December 31, 1991), ITTWD operated units in Belgium, UK, Holland, Ireland, Portugal, Puerto Rico, Japan, Turkey, the Virgin Islands, Ecuador, France and Germany. ITTWD and its units employed more than 2500 employees worldwide, with none located in Tennessee. Between 1986 and 1996, ITTWD had fewer than 12 employees in the United States, all of whom were located at small ITTWD offices in New York or New Jersey.

18. ITTWD had no employees, facilities or property in Tennessee at any time.

19. Promedia operated at all times only in Belgium; it had no employees, facilities or property in Tennessee at any time.

## IV. THE INTERRELATION OF LMB, ITTWD AND PROMEDIA

The undisputed facts disclose the following with regard to LMB's relationship with ITTWD and Promedia. LMB held a 20% stock interest in ITTWD and Promedia respectively. LMB held one of five seats on ITTWD's board of directors. In addition, considering LMB's "Statement of Material Facts in Support of Plaintiff's Motion for Summary Judgment" and excising the portions to which the commissioner objects, we find the following factual statements in the record:

21. All decisions regarding the operations of ITTWD and Promedia, including the business plans and strategic direction of ITTWD and Promedia, are controlled by ITT-appointed directors and by ITTWD officers and were so controlled by them during the audit period.

22. ...[T]he CFO and Chairman of LMB served as assistant controller and director, respectively, for ITTWD... .

23. ITTWD generally enters into "full service" contracts with foreign telephone companies under which ITTWD sells advertising,

publishes the directory, and invoices and collects from the customer/advertiser.

24. ITTWD and Promedia did not sell "yellow pages" advertising for the United States directories, nor did ITTWD or Promedia have any telephone company customers in common with LMB.

25. There may have been international businesses who obtained "yellow pages" advertising through LMB for directories published in the United States and who also obtained similar advertising through ITTWD for directories published overseas. However, LMB and ITTWD did not sell for one another, nor did they share or exchange telephone subscriber lists or sales contact lists.

Other than the payment of dividends (specifically the 1991 payment totaling $12,000,000 from ITTWD and $1,650,000 from Promedia, which were the objects assessed) and the corporate genealogy listed above, the only connection remaining between LMB, ITTWD and Promedia is the fact that during the audit period, six of LMB's executives were on loan to ITTWD for the purpose of training ITTWD's sales staff. These executives were "loaned" for an average of one year per person. They were paid by LMB, who was reimbursed by ITTWD.

The upshot of LMB's argument below and on appeal is that the "unitary business theory" as related by this court in *Louis-Dreyfus*, *infra*, is recognized in the case at bar more by the absence of its components than by their presence. Specifically, in addition to those listed above, LMB urged the following undisputed facts in support of that contention:

1. LMB did not provide accounting, legal, data processing, research and development, engineering, or planning services to either ITTWD and Promedia;
2. LMB did not use the same data processing systems as these corporations;
3. LMB did not use the same system of accounting as these corporations;
4. LMB and these corporations did not advertise for one another;
5. LMB did not prepare income tax returns for these corporations;
6. LMB did not use the same CPA firm as these corporations;
7. LMB internal auditors did not audit the books and records of these corporations;
8. LMB, ITTWD and Promedia did not share a common workers compensation insurance policy;
9. LMB provided no purchasing or service function for ITTWD or Promedia;
10. LMB did not conduct research and development for these corporations;
11. LMB did not sell products to these corporations;

12. LMB did not purchase products from these corporations;
13. LMB and these corporations did not loan funds to one another by assignment of accounts receivable;
14. LMB and these corporations did not borrow jointly;
15. LMB did not guarantee any debts of these corporations, nor did ITTWD or Promedia guarantee any debts of LMB;
16. LMB did not pledge its ITTWD stock as collateral for its own borrowing;
17. LMB never commingled operating funds or other monies or accounts with ITTWD or Promedia;
18. No LMB employee was authorized to issue drafts on any ITTWD or Promedia bank accounts, nor were any ITTWD or Promedia employees authorized to issue drafts on any LMB bank account;
19. LMB and these corporations did not share any common selling, manufacturing, storage or transportation facilities;
20. LMB did not exchange fixed assets with these corporations;
21. LMB did not negotiate or approve contracts for these corporations;
22. Although the CFO and Chairman of LMB served as assistant controller and director, respectively, for ITTWD, there are no other individuals who were officers, directors, or employees of both LMB and ITTWD;
23. LMB and ITTWD do not have the same revenue and expense structure. Generally, LMB's revenues are derived from sales of advertising by LMB as agent for the telephone company, with the telephone company performing all customer/advertiser billing and collection and, in many instances, with the telephone company undertaking all publishing and distribution of directories. By contrast, ITTWD generally enters into "full-service" contracts with foreign telephone companies under which ITTWD sells advertising, publishes the directory, and invoices and collects from the customer/advertiser.

The commissioner seeks to assert that the income derived by LMB is at least an operational investment asset if not the income of a unitary business engaged in the marketing of "yellow pages" advertising worldwide. The commissioner points to the shared employees and officers, the genealogy of ITTWD and Promedia referenced above, and the similar business purpose to support the premise that LMB's investment was not merely passive, but actually an operational function of LMB's business in Tennessee.

## V. THE PROPER STANDARD

It is the taxpayer's assertion in the case at bar, that the commissioner's attempt to tax is well outside Tennessee's authority under the unitary business principle. In support of that assertion, LMB would point the court to our decision on *Louis Dreyfus Corp. v. Huddleston*, 933 S.W.2d 460 (Tenn. Ct. App. 1996).

The commissioner attempts to simplify the discussion below and on appeal to suggest one of two alternative tests. The State would argue that the persuasive power of the "unitary business principle" as discussed in *Louis-Dreyfus Corp.* and *Allied-Signal, supra*, was eroded in *Allied-Signal* to allow taxation of any investment of an operational nature. To support this position, the State quotes the following language:

> We agree that the payee and the payor [of dividends] need not be engaged in the same unitary business as a prerequisite to apportionment in all cases. *Container Corp.* says as much. What is required instead is that the capital transactions serve an operational rather than an investment function . . . .
>
> To be sure the existence of a unitary relation between the payor and the payee is one means of meeting the constitutional requirement. Thus, in *ASARCO* and *Woolworth* we focused on the question whether there was such a relation. We did not purport, however, to establish a general requirement that there be a unitary relation between the payor and the payee to justify apportionment, nor do we do so today.

*Allied-Signal, supra*, at 787, 112 S.Ct. at 2263. This position, however, begs the questions that <u>both</u> alleged tests attempt to answer, i.e.,

> 1. Does the capital transaction allegedly subject to tax add value to the interstate business as a whole <u>as well</u> as to the value within the jurisdiction providing " protection, oppor-tunities, and benefits" to the taxpayer? *See Wisconsin v. J.C. Penney Co.,* 311 U.S. 435, 444, 61 S.Ct. 246, 250, 85 L.Ed. 267 (1946).

and

> 2. Does the realization of that capital bear such a functional or operational relationship to the taxpayer's business <u>and minimum connection</u> with the jurisdiction as to make taxation of that asset constitutionally proper. *See generally, Container Corp. of America v. Franchise Tax Bd.,* 463 U.S. 159, 170, 103 S.Ct. 2933, 2942, 7 L.Ed.2d 545 (1983).

The United States Supreme Court stated this inquiry best:

> Although our modern due process jurisprudence rejects a rigid, formalistic definition of minimum connection, we have not abandoned the requirement that, in the case of a tax on an activity, there must be a connection to the activity itself, rather than a connection only to the actor the state seeks to tax.

*Allied-Signal, supra*, at 778, 112 S.Ct. at 2258 (citing *Quill Corp. v. North Dakota,* 504 U.S. 298, 306-308, 112 S.Ct. 1904, 1909-1910, 119 L.Ed.2d 91 (1992)).

The commissioner argues that *Louis Dreyfus* is distinguished on its facts from the case at bar.

Insofar as the court in *Louis Dreyfus* applied the same principles enunciated by the United States Supreme Court in its long line of "unitary business" cases, including *Allied Signal, supra*, and applicable to the case at bar, we find the commissioner's argument unpersuasive. Says the Court:

> The courts have devised several tests for determining whether a business is unitary. The earliest of these, the so-called "three unities" test required the courts to examine the unity of ownership, the unity of operation as evidenced by central purchasing, advertising, accounting, and management, and the unity of a centralized executive force and general system of operation. *Butler Bros. v. McColgan,* 315 U.S. 501, 508, 62 S.Ct. 701, 704-05, 86 L.Ed. 991 (1942); *Peterson Mfg. Co. v. State,* 779 S.W.2d at 786; *W.S. Dickey Clay Mfg. Co. v. Dickinson,* 200 Tenn. at 34-35, 289 S.W.2d at 537. The second test employed by the United States Supreme Court requires the courts to examine the record for evidence of functional integration, centralization of management, and economies of scale. *F.W. Woolworth Co. v. Taxation and Revenue Dep't,* 458 U.S. at 364, 102 S.Ct. at 3135; *Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. at 438, 100 S.Ct. at 1232. Other courts have used the "dependency and contri-bution" test to determine whether the business components under consideration contribute to each other and the operation of the business as a whole. *A.M. Castle & Co. v. Franchise Tax Bd.,* 36 Cal.App.4th 1794, 43 Cal.Rptr.2d 340, 346 (1995); *Ramsay, Scarlett & Co. v. Comptroller,* 302 Md. 825, 490 A.2d 1296, 1302 (1985); *Silent Hoist & Crane Co. v. Director, Div. of Taxation,* 100 N.J. 1, 494 A.2d 775, 784 (1985). These tests are not mutually exclusive but rather are alternative ways to determine whether the components of the business operate under "an umbrella of central management and controlled interaction," *Exxon Corp. v. Wisconsin Dep't of Revenue,* 447 U.S. at 224, 100 S.Ct. at 2120.
>
> No single factor is controlling under any of the tests. Instead, the courts examine these factors in combination to determine whether the business is unitary. Since states may only tax value having substantial connection with the state, the courts must consider not only the relationship between the non-resident business and the non-resident component whose income is sought to be taxed but also the relationship between the in-state component and the non-resident component. See *Central National-Gottesman, Inc. v. Director, Div. of Taxation,* 14 N.J. Tax 545, 556-57 (Tax.Ct.1995); *In re Income Tax Protest of Griffin Television, Inc. (Griffin Television, Inc. v. State ex rel. Oklahoma Tax Comm'n),* 877 P.2d 588, 593 (Okla.1994).

*Louis Dreyfus Corp. v. Huddleston*, 933 S.W.2d 460, 468 (Tenn. Ct. App. 1996).

The state also argues that its interpretation of the facts under the "operational investment" standard would trump the abundance of evidence regarding the absence of a unitary business. In this attempt, however, the commissioner seems to echo New Jersey's argument in *Allied-Signal*.

Said the Supreme Court:

> New Jersey does not appear to dispute the basic proposition that a state may not tax value earned outside its borders. It contends instead that all income of a corporation doing any business in a State is, by virtue of common ownership, part of the corporation's unitary business and apportionable. New Jersey's sweeping theory cannot be reconciled with the concept that the Constitution places limits on a State's power to tax value earned outside of its borders. To be sure, our cases give States wide latitude to fashion formulae designed to approximate the in-state portion of value produced by a corporation's truly multistate activity. But that is far removed from New Jersey's theory that any business in the State, no matter how small or unprofitable, subjects all of a corporation's out-of-state income, no matter how discrete, to apportionment.

*Allied-Signal, supra*, at 784, 112 S.Ct. at 2261 (citations omitted). We are equally unpersuaded.

## VI. ANALYSIS

The unavoidable conclusion is that the facts as presented show neither a unitary business on the part of LMB, ITTWD and Promedia, <u>nor</u> an operational or functional investment on the part of LMB in ITTWD and Promedia. Neither party disputes the fact-sensitive nature of any taxation inquiry. Tax assessments are presumed valid unless the taxpayer proves by clear and cogent evidence that the commissioner has caused extraterritorial value to be taxed. *See Container Corp. Of America v. Franchise Tax Bd.,* 463 U.S. 159, 170, 103 S.Ct. 2933, 2942, 7 L.Ed.2d 545 (1983); *Stratton v. Jackson,* 707 S.W.2d 865, 867 (Tenn. 1986); *Ace of Clubs v. Huddleston,* 872 S.W.2d 679, 681 (Tenn. Ct. App. 1993); *Louis Dreyfus Corp. v. Huddleston,* 933 S.W.2d 460 (Tenn. Ct. App. 1996). In our *de novo* review we find clear and cogent proof that extraterritorial value has been taxed. The undisputed facts in the record before us suggest no unitary relationship between the taxpayer and the entities concerned and no operational investment.

Even if one could say that the birth, nature and interplay of executive officers in these corporations could amount to ownership and control of ITTWD and Promedia by LMB and its parent BellSouth Enterprises, this ownership and control is but one of many circumstances which may be examined to show Constitutional taxability. LMB showed below that the entities involved had very little in common, much less in kind. Their economies were functionally separate entities. Though

ITTWD and Promedia may have been born from LMB and ITT, neither owes its continued existence to LMB. Under the circumstances, we find it hard to believe that ITTWD, Promedia and LMB are functionally integrated under any standard.

## VII. CONCLUSION

Under the undisputed facts of this case, the dividends earned by LMB are not taxable by Tennessee. The chancery court's judgment to the contrary should be and is hereby reversed. The case is remanded with the chancellor directed to enter summary judgment in favor of LMB in the amount of its refund plus any interest properly accrued and owing, and for such further proceedings as may be necessary. Costs on appeal are taxed against the State of Tennessee.

_____
WILLIAM B. CAIN, JUDGE

CONCUR:


_____
BEN H. CANTRELL, P.J., M.S.


_____
WILLIAM C. KOCH, JR., JUDGE